HEARD APRIL TERM, 1878.

CASE No. 660.

THE STATE v. F L. CARDOZA.

1. This court cannot set aside the verdict of a jury on the ground that the verdict was against the evidence, or unsupported by it; such right belongs exclusively to the Circuit Court. The decision of that court is final and conclusive, unless it has committed some error of law.

2. Additional jurors being required at a Circuit Court held in October, 1877, it was proper for the board of jury commissioners in the presence of the

Circuit Court, to take from the names of jurors legally in the jury box the names of such as resided within five miles of the court-house, and place them in a separate apartment of such jury box, and then to make their drawing of additional jurors from such apartment.[*]

3. Defendant was put upon his trial under an indictment for conspiracy. Jury No. 1 was called, and the state challenged two jurors, and two other jurors were drawn in their stead from the supernumerary list, who were challenged by defendant, before he indicated his acceptance or rejection of any other jurors. *Held,* that the challenges thus made were properly disallowed.[†] WILLARD, C. J., *dissenting.*[*]

4. *Quere:* What is the proper mode of empaneling a jury for the trial of a misdemeanor? *Legislation and cases reviewed.*

WILLARD, C. J., and McIVER, A., J., *hold,* that they should be drawn anew, in every case, in open court, and in the presence of the accused, from the whole number of persons serving as jurors. HASKELL, A. J., *holds,* that the juries should be drawn by lot and organized into juries Nos. 1 and 2, for the trial of misdemeanors, at the commencement of a term of the Court of General Sessions; that when the defendant is put upon his trial, the proper jury in course, in its entirety, should then be presented to him: to supply vacancies caused by challenge, or otherwise, names should be drawn by lot from the list of supernumeraries, and the parties, unless they can show cause, must take them as they are thus drawn.

5. A conspiracy on the part of a public officer, and others conspiring with him, with intent to cheat and defraud the state, through the forms of his own office, is a conspiracy to injure the public, imports a crime under the law of this state independently of the means used for that purpose, and is indictable at common law.

6. A false voucher, manufactured by a state treasurer in order to cover the unlawful abstraction of state funds in his hands, is of the very essence of deception, and thereby the state is cheated and defrauded.

7. When a conspiracy is formed, which has for its object the issuing of a pay-certificate on the state treasury to a fictitious person, for the purpose of defrauding the state, the crime is then complete, and an indictment which charges a conspiracy to this extent is sufficient, although it does not give a specific description as to numbers, date, &c., of the pay-certificate issued in accordance with such agreement.

8. An indictment charging a conspiracy to defraud the state, as it regards its property or revenue, sustained; although no agreement was alleged as to the definite means to be employed for that purpose. *Cases reviewed.*

9. An extra term of the Court of General Sessions, duly convened, for which no petit jurors were drawn and summoned, *held,* to be a legally constituted court, at which an indictment might be found by the grand jury.

10. It is not error to admit evidence of the declarations of persons who are

[*] S. P., State *v.* Smalls, *post* page 262.  [†] See separate opinion of McIver, A. J., *post* page 287.

charged as co-conspirators with the defendant, not made in his presence, in advance of any proof of the conspiracy other than the testimony of an accomplice.

11. A witness may refresh his memory by memoranda made by himself at the time of the transaction about which he is testifying; and it is not an objection to his use of such memoranda, that they are written in characters capable of being translated only by himself.*

12. On the trial of A under an indictment for conspiracy committed by A, B, and C, entries in the books of B and C, a partnership, made by their clerk, a stranger to the conspiracy, may be received as evidence tending to strengthen the testimony connecting B and C with the conspiracy.

13. It is no ground for striking out evidence, that it fails to amount to proof of what was intended by the party introducing it.

14. Where defendant's counsel, in a criminal trial, on the cross-examination of a witness for the state, introduces a subject affecting the defendant, he cannot complain if the state's counsel cross-examine the defendant himself upon the same subject, and introduces witnesses in reply, following in the same line of proof.

15. Where parties to a conspiracy give testimony for the state on the trial of a co-conspirator, entries in their books, corroborating their testimony, alleged to have been made contemporaneously with the transactions which constitute the conspiracy, may be considered by the jury, and if made at the time and for the purpose stated, should be regarded as circumstances in support of their oral testimony.

Before TOWNSEND, J., at Richland, October Term, 1877.

This was an indictment against Richard H. Gleaves, Samuel J. Lee, Josephus Woodruff, A. O. Jones and Francis L. Cardoza, for conspiracy.

At a special term of the Court of General Sessions for Richland county, duly convened, which was begun to be holden in Columbia on August 27th, 1877, Judge J. B. Kershaw presiding, the grand jury being in attendance, but no petit jurors having been drawn or summoned or being in attendance, a true bill was found against the parties above named, for a conspiracy to cheat and defraud the State of South Carolina out of $4000, by means of a false warrant or legislative pay-certificate, drawn in favor of C. L. Frankfort, a fictitious person.

The indictment contained four counts. The first count read as follows:

* S. P., State *v.* Smalls, *post* page 262.

That at the times hereinafter mentioned, and before and afterwards, Richard H. Gleaves was president of the Senate of the General Assembly of the State of South Carolina, Samuel J. Lee was speaker of the House of Representatives of the General Assembly of the said state, Josephus Woodruff was clerk of the said Senate of the said state, A. O. Jones was clerk of the said House of Representatives of the said state, and Francis L. Cardoza was treasurer of the said state.

That the said Richard H. Gleaves, Samuel J. Lee, Josephus Woodruff, and A. O. Jones, and Francis L. Cardoza, late of the county and state aforesaid, on the tenth day of January, in the year of our Lord one thousand eight hundred and seventy-four, with force and arms, at Columbia, in the county and state aforesaid, unlawfully, falsely, fraudulently and corruptly, did conspire, combine, confederate and agree together, by divers false pretences, to cheat and defraud the said State of South Carolina of a large sum of money, to wit, the sum of four thousand dollars, by means of a certain false and fraudulent paper, in the form of and purporting to be a warrant on the state treasurer, commonly called and known as a pay certificate, drawn by the said Richard H. Gleaves, president of the senate as aforesaid, and the said Samuel J. Lee, speaker of the house of representatives as aforesaid, on the treasurer of the State of South Carolina aforesaid, and attested by the said Josephus Woodruff, as clerk of said senate, and said A. O. Jones, as clerk of said house of representatives, in favor of one C. L. Frankfort, for the said sum of four thousand dollars for account of legislative expenses, they, the said Richard H. Gleaves, Samuel J. Lee, Josephus Woodruff, A. O. Jones, and Francis L. Cardoza, then and there falsely pretending and asserting that the said warrant was lawfully drawn by the said Richard H. Gleaves and Samuel J. Lee in favor of the said C. L. Frankfort for an amount due to the said C. L. Frankfort by the said State of South Carolina, whereas in truth and in fact, the said warrant was not lawfully drawn by the said Richard H. Gleaves and Samuel J. Lee; and whereas, in truth and in fact, the said warrant was not for an amount due the said C. L. Frankfort by the said state, there being no such person as the said C.

L. Frankfort, the said name being the name of a fictitious person, and the said warrant being false and fraudulent, as they, the said Richard H. Gleaves, Samuel J. Lee, Josephus Woodruff, A. O. Jones and Francis L. Cardoza, each of them, then and there well knew; and that in pursuance of the said conspiracy, combination, confederacy and agreement so had amongst themselves, the said Richard H. Gleaves, as president of the senate as aforesaid, and the said Samuel J. Lee, as speaker of the house of representatives as aforesaid, on the tenth day of January, in the year of our Lord one thousand eight hundred and seventy-four, at Columbia, in the county and state aforesaid, with the knowledge and consent of the said Josephus Woodruff, A. O. Jones and Francis L. Cardoza, did draw and sign the warrant aforesaid, and thereupon the said Josephus Woodruff, as clerk of the senate as aforesaid, and the said A. O. Jones, as clerk of the house of representatives as aforesaid, did, with the knowledge and consent of the said Richard H. Gleaves and Samuel J. Lee and Francis L. Cardoza, then and there attest the warrant aforesaid, and the said Francis L. Cardoza, with the knowledge and consent of the said Richard H. Gleaves, Samuel J. Lee, Josephus Woodruff and A. O. Jones, did then and there, in payment of the said warrant, give, deliver and issue and divide between them, the said Richard H. Gleaves, Samuel J. Lee, Josephus Woodruff, A. O. Jones and himself, the said Francis L. Cardoza, certain evidences of indebtedness of the State of South Carolina, commonly called and known as certificates of indebtedness, to the amount of four thousand dollars, and of the value of four thousand dollars, the money and property of the said State of South Carolina, they, the said Richard H. Gleaves, Samuel J. Lee, Josephus Woodruff, A. O. Jones and Francis L. Cardoza, and each of them, then and there well knowing that the said warrant so drawn, used and paid as aforesaid, was not a legal and valid warrant, but was false and fraudulent, to the great damage of the said State of South Carolina, to the evil example of all others in like cases offending, and against the peace and dignity of the state.

The second count was substantially the same as the first,

except that it charged that the pay-certificate was paid in money, instead of in certificates of indebtedness, as is charged in the first count. The third count differs from the two preceding, in that it omits to allege any payment at all of the pay-certificate.

The fourth count read as follows:

And the jurors aforesaid, upon their oaths aforesaid, do further present: That Richard H. Gleaves, Samuel J. Lee, Josephus Woodruff, A. O. Jones and Francis L. Cardoza, late of the county and state aforesaid, on the tenth day of January, in the year of our Lord one thousand eight hundred and seventy-four, with force and arms, at Columbia, in the county and state aforesaid, unlawfully, falsely, fraudulently and corruptly did conspire, combine, confederate and agree together, by divers false pretences and indirect means, to cheat and defraud the said State of South Carolina of a large sum of money, to wit, of the sum of four thousand dollars, to the great damage of the said State of South Carolina, to the evil example of all others in like case offending, and against the peace and dignity of the state.

JOHN R. ABNEY,
*Solicitor Fifth Circuit.*

At general term of the Court of General Sessions for the county of Richland, begun to be holden at Columbia on the 22d day of October, 1877, there were present the Honorable C. P. Townsend, presiding judge, the grand jury, and thirty-one petit jurors, who were drawn and summoned in the manner prescribed by law. There being a deficiency of five, the court ordered a *venire* to issue for five additional jurors. A majority of the jury commissioners drew from a separate apartment in the jury box, into which had been placed the names of persons resident within five miles of the court-house, long after a proper and legal list of jurors had been prepared for this county for the year 1877, and from such separate apartment returned five names. Two of the jurors drawn on the original panel were then excused, leaving thereby a deficiency of two upon the panel, to fill which deficiency the court ordered a *venire* to issue for two additional petit jurors. A majority of the jury commissioners drew from a

separate apartment in the jury box, prepared as hereinbefore set forth, and returned the names of H. P. Green and John Crowley. The said additional jurors were duly summoned and appeared. The petit jurors were then organized by drawing twelve names, including those of Green and Crowley, to constitute jury No. 1, twelve other names to constitute jury No. 2, and the remaining twelve names were put on the list of supernumeraries.

On November 1st the case was called for trial. A *nolle prosequi* was entered by the attorney-general * as to the defendants, Samuel J. Lee, Josephus Woodruff and A. O. Jones. Richard H. Gleaves not having been arrested, the trial proceeded against Francis L. Cardoza alone.

Jury No. 1 was called; whereupon the state peremptorily challenged two jurors, and two others were then drawn from the supernumerary list to fill their places. The defendant then challenged these two. The court ruled that the defendant did not have the right to challenge jurors who were drawn to fill the vacancies on the panel—to which ruling the defendant excepted. The defendant objected to jurors H. P. Green and John Crowley, on the ground that they had not been drawn in accordance with law—their names having been drawn from the separate apartment in the jury box prepared as aforesaid. The court overruled the objection, and the defendant excepted. Defendant then challenged five jurors peremptorily, all of whom were on the jury as first organized, and including Green and Crowley. During the progress of the trial several questions upon the admissibility of evidence were raised, which are noticed in defendant's exceptions.

Counsel for the defendant submitted instructions for the jury, upon which the court charged as follows: [Those not brought to the attention of this court being omitted.]

5. "That the fourth count of the indictment is fatally defective in this, that it does not contain a statement of the means by which the alleged conspiracy was effected and consummated; and that upon the said count the defendant should be acquitted."

The court said: "I think, on the authorities, that this count can be sustained."

* Hon. James Connor.

7. " That the facts and circumstances relied on for corrobora-
tion must be such as are altogether independent of the accomplice,
and taken independently lead to the inference, not only that the
offence as charged has been committed, but that the prisoner is
implicated in it; that the entries in the book produced by the
witness, Woodruff, and the entries in the books of the Republican
printing company, do not constitute evidence in corroboration of
the evidence of the accomplices, Woodruff and Jones, as against
the defendant now on trial, being nothing as against him beyond
the mere declarations of the accomplices themselves."

The court said : " This has been charged in part, and in part
it has not.

" This evidence has already been admitted by the court for
this reason, that when those entries were made in the note book
of Josephus Woodruff the conspiracy had not been consummated,
and therefore they were the declarations of Woodruff and Jones
in furtherance of the conspiracy. The court adheres tb that
ruling, and they are proper matters for your consideration. ·

" The same objection was made in the progress of the trial on
questions of evidence, and I have already charged you on the
first point of this instruction; that is, that those circumstances in
corroboration of the accomplices must be independent of the
accomplices. That instruction is, therefore, given you again. The
latter part of the instruction the court does not feel inclined to
give; that is, that the entries in the book produced by the wit-
ness Woodruff, and the, entries in the books of the Republican
printing company, are nothing but the declarations of those
accomplices. I charged you that where an accomplice is simply
corroborated by declarations made anterior to the date of the
transactions, that evidence does not go in corroboration. But
these entries were made contemporaneously with the transaction,
and they are not unsupported corroboration, but they are facts
noted down at the time of the transaction, and, therefore, may go.
in corroboration of the accomplices."

8. " That the defendant should be acquitted upon the second
count in the indictment, unless the jury should conclude from the
evidence that the conspiracy alleged to have been consummated
was effected by means of a false token or counterfeit letter within

the meaning of the statute, and by a payment of money, the property of the state, to the co conspirators, as therein stated and charged, and, moreover, that such payment was made in pursuance and in furtherance of such conspiracy."

The court said : " This I decline to charge."

9. " That the declarations and admissions of a co-conspirator, made after the plot of a conspiracy is consummated, and not in furtherance thereof, do not constitute competent evidence of the fact of the conspiracy as against others, co-conspirators, and that, therefore, the entries upon the books of the Republican printing company, made after the alleged conspiracy was consummated, and relating only to the distributing of the plunder, should not be considered by the jury as against the defendant."

The court said : " This instruction is refused."

10. " That it being the duty and office of the treasurer of the state to pay joint certificates drawn by the president of the senate and the speaker of the house of representatives of the general assembly of the state, and attested by the clerk of each house, respectively, the fact that the joint certificate referred to in the indictment was paid by the defendant, as such treasurer, ought not to be considered as in confirmation of the evidence of the accomplices in the case."

The court said : " This I decline to charge."

11. " That deception is a necessary element of the offence of cheating ; that to the commission of this offence against the state, it is necessary that the means employed should be calculated to deceive, and should actually deceive the state ; that in respect of this offence, the state can be deceived only by deceiving the officer or officers of the state with whom the transaction is alleged to have occurred ; that where such officer is not deceived, and, within the technical meaning of the term, cannot be cheated ; that an officer cannot be convicted of conspiracy to cheat the state where the means employed are not such as, if the conspiracy be consummated, would be sufficient to convict him of the offence of cheating the state ; and that upon the charge of conspiracy to cheat the state, as averred in the indictment herein, by means which were not calculated to deceive the defendant, the said defendant cannot be convicted."

The court said : " On this, I charge you I do not think it has anything to do with the case."

12. " That in determining the verdict in this case, evidence in reference to other and distinct offences alleged to have been committed by the defendant at times either before or after the transactions alleged in the indictment, must be deemed incompetent, and, therefore, is not entitled to any weight whatever, and should not be considered by the jury."

The court said : " I still charge you on this point, and it is in reference to the ' Merriam ' certificate and other fraudulent transactions which the state pretends this defendant had with other parties ; the substantive defence is, that this defendant, as an official, was incorruptible. I admitted this testimony in regard to the ' Merriam ' certificate in reply to that defence, and, therefore, I charge you now that I still think the testimony is competent as a matter of testimony, and you can take it into consideration."

The case was then given to the jury, who returned a verdict of guilty.

The defendant thereupon submitted a motion for a new trial upon the following grounds: [Omitting such as were not brought before this court for review.]

3. Because the court admitted the evidence of the declarations of R. H. Gleaves as a co-conspirator, not made in the presence of this defendant, before evidence other than that of an accomplice had been introduced to establish the conspiracy, and before evidence of any character had been introduced to connect A. O. Jones with the conspiracy, as charged in the indictment.

4. Because the witness, Josephus Woodruff, was allowed to refresh his memory by reference to a book, purporting to be a diary written in phonographic characters peculiar to the witness, and such as could not be verified in court; and because the said book was received in evidence as against this defendant, and matters said by the witness to be therein contained were translated and read by him to the jury.

5. Because the books of a partnership, known as the Republican printing company, to which the defendant was a stranger, were received in evidence, and entries therein read to the jury;

although it appeared that such entries were made by one W. H. Jackson, who was not produced as a witness, and not proved to be dead or absent from the state.

6. Because the entries in the books of the said Republican printing company were received in evidence against this defendant, on the ground that in one instance an entry of $800 to the credit of Josephus Woodruff, should be regarded as a declaration of the said Woodruff, and in another instance an entry of a like sum to the credit of A. O. Jones, as a declaration of the said Jones; although the said entries were made by the said Jackson, without evidence of the knowledge or assent of the said Woodruff and Jones, and although they contained nothing to establish the privity of this defendant.

7. Because the said entries on the books of the Republican printing company were received in evidence as declarations in corroboration of the evidence of the said Woodruff and Jones as accomplices, before such evidence had been confirmed by the introduction of any independent fact; although the said entries were nothing more, in any point of view, than the mere evidence of the accomplices themselves, and could not be treated as independent facts and circumstances; and although they were declarations, if at all, made after the consummation of the conspiracy, not in furtherance thereof, and with reference solely to a division of the plunder.

8. Because an entry in the ledger of the said Republican printing company, of $9750, "paid to Sunday-school fund, C. L. F.," was received in evidence against this defendant, although the said entry was made by the said W. H. Jackson, an employee of the said company, and was not contained in a book of original entry, and although the witness, Woodruff, proved that it did not refer, so far as he knew, to the subject matter of the conspiracy in question, but to other and wholly different transactions by the said company with this defendant.

9. Because evidence was admitted in reference to a pay certificate, alleged to have been issued to one F. L. Christopher, which, if connected with this defendant, was irrelevant to the issues herein, and tended to establish a distinct substantive offence, wholly unconnected with the offence charged in this

indictment; but which, according to the evidence, was issued and paid without the knowledge or consent of this defendant, in the regular order of business and to a reputable banking-house in the city of Columbia.

10. Because the court, during the cross-examination of the defendant as a witness, ruled as competent for the purposes of contradiction, questions in reference to facts and circumstances irrelevant and not pertaining to any of the issues of the case; and for the declared purpose of contradiction, admitted evidence in reply wholly immaterial to the issues, and tending solely to establish against the defendant other and distinct offences, and thereby prejudice the minds of the jury against him.

11. Because evidence was admitted in reply ostensibly for the purpose of contradicting the evidence of the defendant, as a witness, in reference to facts and circumstances wholly irrelevant and immaterial to the issue, as to which the defendant had not been interrogated, and which tended, not to contradict the witness, but solely to establish against the defendant other and distinct offences, and thereby prejudice the minds of the jury against him; and because, for such purpose, entries in phonographic characters in the diary of the witness, Woodruff, were translated by him and read to the jury.

12. Because evidence was admitted in reply which did not tend to establish any fact inconsistent with the defence, but which was cumulative in its whole character, and if competent at any stage of the trial, could only have been introduced as evidence in chief.

14. Because the witness, Hardy Solomon, was permitted to testify, as evidence in reply, to facts and circumstances wholly irrelevant to the material issues of the case, not in reply to evidence introduced by the defence, and with reference to which the witness for the defence had not been interrogated; and upon the admission of this witness that he had testified to the same subject matter before a legislative committee, the printed report of which, in the volume of legislative reports, he presumed was correct, the defence was not permitted to show by reference to the printed report, a material variance in his evidence in this, that whilst the witness testified on the trial that he had paid to

Moses $7000, and to Gleaves and Lee, each, $5000, and to the defendant either $3000 or $4000, he testified before the legislative committee that the total amount of his payments on this account was $15,000 or $17,000.

15. Because evidence was admitted to show that a statement in writing was delivered some time early in 1874 to the witness, A. O. Jones, of the assets of the Republican printing company, in the handwriting of LeGrand Benedict, the business manager, containing reference to a certificate of " C. L. Frankfort, $2400," and the entries upon such statement were received in evidence, although it was not proved that Benedict was dead or absent from the state, or that the settlement was true, or that any other fact existed to connect it with the material issues of this case.

16. Because the verdict in the case is contrary to and against the weight of the evidence.*

The motion for new trial was refused; whereupon the counsel for the defence excepted.

A motion in arrest of judgment was then made upon the following grounds:

1. That the jury rendering the verdict herein was not a legal and competent jury, and was not drawn, summoned, and empaneled according to law: In this, that to fill the deficiency in the number of jurors required by law, the names of five persons were drawn from an apartment of the jury box separate from the apartment containing the legal and proper list of jurors prepared at the time and in the manner prescribed by statute; that the jury commissioners of the said county were not authorized by law to place the names of jurors in such separate apartment, and to draw therefrom " the jurors to supply the deficiencies " in the regular panel; and that the persons so drawn were not in law competent to act as jurors. And in this, that the defendant was denied the right of peremptory challenge of jurors called to

---

* Under this head six specifications are set forth, but want of space forbids their insertion; and they cannot be material to the case, inasmuch as the court disposes of them all in the first paragraph of its opinion, without reference to their merit.—REPORTER.

take the place of other jurors removed from the panel by challenge.

2. That the indictment in each and every count thereof is fatally defective, in that the statement of the offence charged does not contain an averment of a conspiracy to cheat by means of " a false token or a counterfeit letter in another man's name."

3. That the indictment is fatally defective, in that the averment of the purpose and object of the conspiracy charged does not import a crime under the laws of this state.

4. That the indictment is fatally defective, in that the certificate therein referred to as the means by which the offence is charged to have been done and consummated, is not averred to be, and is not in law, either "a false token or a counterfeit letter in another man's name."

5. That the indictment is fatally defective, in that the acts charged against the defendant are repugnant and contradictory; and in that the defendant is charged with having conspired to cheat the state by means which were not calculated to deceive, and did not deceive, the state, because not calculated to deceive, and not such as could deceive, the defendant as the officer of the state charged with the performance of the act necessary to the consummation of the offence.

6. That the indictment is fatally defective, in that the offence therein charged is not set forth and stated with sufficient clearness and certainty; that the means by which, as it is alleged therein, the offence was intended to be, and was, consummated, are not set out either in substance or according to the tenor thereof; that the warrant or pay-certificate, described as the said means, is not set out with sufficient precision and certainty, and by such special and specific description as to number, date, and other peculiar and distinguishing marks as to identify the charge, and fully, fairly, substantially, and formally to describe to the defendant the crime for which he is held to answer.

7. That the special session of the Court of General Sessions, at which, as it appears, the indictment herein was found by the grand jury, was not a legally constituted court for such purpose; in this, that petit jurors were not drawn and summoned, and in attendance, upon the said session of court.

The motion in arrest of judgment was denied. In denying the motion for new trial and in arrest of judgment, the court entered the following decision :

\*          \*          \*          \*          \*          \*          \*          \*

The third ground alleges error in the court in admitting the declarations of R. H. Gleaves, as a co-conspirator, before evidence had been introduced to establish the conspiracy, and before evidence of any character had been introduced to connect A. O. Jones with the conspiracy charged. The court in its ruling distinctly stated the rule of evidence to be, " that when there was *prima facie* proof of a conspiracy, then the declarations of co-conspirators distinctly relating to and in furtherance of the conspiracy were admissible." There was proof sufficient to establish *prima facie* the fact of the existence of the conspiracy, and on this ground it was ruled that the declarations of R. H. Gleaves were competent evidence. It was ruled by the court that it was not necessary to the conviction of the defendant to prove a conspiracy on the part of all of the parties mentioned in the indictment, but only in reference to any two or more of them. In the judgment of the court, it was not considered necessary for the state to connect A. O. Jones with the conspiracy, as a prerequisite to the admission of the declarations of Gleaves.

The fourth ground objects to the ruling of the court, in allowing the witness, Woodruff, to refresh his memory, in regard to the conspiracy charged, by reference to a private book containing contemporaneous entries of the transaction. It was ruled by the court, that the witness should be entitled to refer to this book to refresh his memory as to the transaction. The testimony of Woodruff was, that he had made the entries at the time in the book, and he was only allowed to refer to them for the purpose of refreshing his memory. The book was not introduced in evidence.

In regard to the fifth ground, it is only necessary to state that the testimony of Woodruff showed that W. H. Jackson, the party who had made the entries in the books referred to, was absent, and it was not known, nor could it be ascertained, where he was. His handwriting was proved. The books were admitted upon two grounds : 1st, a book containing original entries relating to

o

transactions connected with and in furtherance of the alleged conspiracy; 2d, as containing declarations of co-conspirators relating to and in furtherance of the conspiracy.

The sixth ground is akin to the fifth. Woodruff and Jones were the partners constituting the Republican printing company. The books introduced were the books of the concern. Knowledge of their contents may have been presumed on the part of the two partners. Besides, there was evidence to show that both Woodruff and Jones had full knowledge of the two entries referred to in this ground.

The seventh ground assails the admissibility of the books of the Republican printing company, because they contained declarations of the co-conspirators made after the consummation of the conspiracy, and not in furtherance thereof, and were not independent facts and circumstances of such a character as to render them admissible in corroboration of the accomplices. The entries in the books were not admitted solely for the purpose of corroboration. Even if they had been, having been made contemporaneously with transactions to which they related, they were in the nature of independent facts, because of the impossibility of their fabrication for the purpose, and might have gone in confirmation of the evidence of the accomplices. That they were not made until after the consummation of the conspiracy, and could not have been in furtherance of it, does not appear from the testimony relating thereto, until the entries were made and proper credits for the amounts received by each in the division of the fruits of the conspiracy had been given, it had not been entirely consummated. But the fact, that the books were not admitted to furnish corroboration solely to the accomplices, disposes of this ground.

The eighth ground assails the correctness of the ruling of the court in reference to an entry in the books of the Republican printing company, of $9750, when it was made by one W. H. Jackson, an employee of this company, and Woodruff testified that it did not relate, so far as he knew, to the conspiracy in question. The entry in the book was accompanied with the letters S. S. F. and C. L. F. As the alleged means of consummating the conspiracy charged was a pay-certificate, payable to

C. L. Frankfort; and the initials of the payee occurred in connection with the entry, the court ruled that the entry in the books, with the accompanying letters and testimony of Woodruff, should go to the jury, and if they found it related to the conspiracy in question, then they might consider it as competent testimony. It was not admitted as evidence by the court, only to this extent.

The ninth ground alleges error in the ruling of the court, that the pay-certificate issued to one F. L. Christopher was allowed to be introduced by the state. The main defence of the defendant was that he had been a faithful and incorruptible officer. To establish this fact, while Woodruff was on the stand, and in his cross-examination, he was interrogated in reference to a pay-certificate issued to one Merriam, and the paper was produced and introduced in evidence. It was shown by Woodruff that this was a fraudulent claim, and had been presented to the defendant by him, who, instead of accepting it, required Woodruff to mark it canceled and unused. To meet this general defence, set up while the state was developing its case, this pay-certificate, and others of a like character, issued at the same time with the Merriam certificate, were admitted in evidence.

In the tenth ground, there is error alleged on the part of the court in allowing questions upon the defendant for the purpose of his contradiction in regard to facts and circumstances irrelevant and not pertaining to the issues of the case. It was ruled by the court that the matters about which the defendant was interrogated, for the purpose of laying the foundation for a contradiction, had been rendered material and relevant by the testimony extracted by the defendant's counsel from the witness of the state, as well as that delivered by the defendant himself. A reference to the evidence will disclose the materiality of these matters to the issues of this case.

The eleventh ground contains a general complaint against the admissibility of the evidence in reply for the state. No witness in the reply contradicted the defendant as to any matters except those in relation to which the defendant was specially interrogated. Woodruff, in the reply, did not read to the jury from a

book introduced in evidence as such, but referred to it for the purpose of refreshing his memory.

The twelfth ground is general. A review of the testimony admitted in the reply will not sustain the allegation that it was cumulative and incompetent.

The fourteenth ground alleges error, first in admitting the testimony of Hardy Solomon to contradict the defendant in regard to matters not relevant and pertinent to the issues of the case; and second, that according to the report of the testimony of Hardy Solomon before a legislative committee, there was a variance between his testimony then and on this trial, and there was no contradiction in fact. The court ruled that it was competent to contradict the defendant by the testimony of Solomon, because the foundation to do so had been properly laid when the defendant was on the stand, and the matters about which he was interrogated were material, and had been made so by the testimony of the defendant, to the issues of the case. In regard to the proof of the testimony delivered by Hardy Solomon before the legislative committee, the counsel is clearly mistaken. The report of the committee containing the evidence was offered and ruled to be incompetent. But the court distinctly ruled that the witness, Solomon, could be interrogated in reference thereto, and the report might be read in order to refresh his memory.

The fifteenth ground raises an objection to the admissibility of evidence after the trial. When it was introduced, there was no objection made, and it is now too late to assail its competency.

After a careful review of all the testimony, and a consideration of the objections suggested to the rulings of the court on questions of law, I am satisfied that the motion for a new trial should be denied, and it is so ordered and adjudged.

The motion in arrest of judgment is likewise based upon various grounds. These will now be considered.

\*       \*       \*       \*       \*       \*       \*       \*

The motion in arrest of judgment is refused, and it is so adjudged.

                                        C. P. TOWNSEND.

November 22d, 1877.

The sentence was then pronounced upon the defendant as follows : " The sentence of the court is, that the defendant, Francis L. Cardoza, be confined in the county jail for two years, and do pay a fine of four thousand dollars ; and in default of the payment of the fine that he be confined in the county jail for one year, to commence after the expiration of the two years imprisonment imposed as a part of this sentence."

(Signed)　C. P. TOWNSEND,

November 26th, 1877.　*Presiding Judge.*

The defendant gave notice of appeal.

The grounds of appeal cover the same grounds that are taken in the motions for new trial and in arrest of judgment, and in the exceptions to the judge's rulings and charges.

*Messrs. Melton & Wingate,* for appellants.

*Hon. L. F. Youmans,* Attorney-General, *Hon. James Connor,* late Attorney-General, and *Mr. C. R. Miles,* for respondent.

*Mr. Samuel W. Melton,* for appellants.

It is admitted that a motion for a new trial upon the ground of insufficient evidence, is not well made, unless it appear that the preponderance of evidence is so strong against the verdict as to induce the impression that the jury were actuated by motives outside of the case, as made by the evidence ; that " negligence, caprice, partiality, corruption, misunderstanding or other such cause, has been disturbing the just exercise of their judgments." 15 *Rich.* 219.

The learned counsel then reviewed the testimony, and deduced the conclusion that " the judgment is without one jot or tittle of evidence to support it."

The motion in arrest of judgment presents three leading points : 1. That the jurors summoned to complete the panel were not drawn according to law ; 2. That the right of challenge to jurors was denied to the defendant ; 3. That the indictment is fatally defective in the particulars set forth in the motion in arrest of judgment.

*First.* Petit jurors for the term had been regularly drawn and

summoned from the jury box, properly prepared in January. *Gen. Stat.* 518. To complete the panel *venires* were issued for five, and, afterwards, for two more, additional jurors. These additional jurors were drawn from a separate apartment in the jury box, prepared in the manner indicated in Section 4 of act of June 8th, 1877. 16 *Stat.* 260. But nothing in this act applies to counties, for that year, where proper lists had been legally prepared in January. Under Section 23, Chapter CXI. of General Statutes, additional jurors were drawn "from the bystanders or from the county at large, to complete the panel." Section 24 of this act was amended November 19th, 1873, (15 *Stat.* 485,) and in such amendment the proper mode was indicated of summoning jurors from the bystanders; but the provision relating to the selection of jurors from the "county at large" remained without amendment; and it was the established practice for the officers, when additional jurors were needed, to draw them from the jury box. The act of June 8th, 1877, in its first section, applies only to counties where there had been a failure to prepare a proper list for the year 1877. The second section repeals all laws which provide for the summoning of jurors from the bystanders, and directs that additional jurors shall be drawn, "such jurors to reside within five miles of the court-house." The fourth section provides for a separate apartment in the jury box to be filled when the jury lists are prepared for the year, with the names of those living within five miles, &c. The fourth section can only apply to the preparation of the jury list for each year—that is, in January.

Whilst the second section repealed the law as to bystanders, it did not affect the statute providing for selection from the "county at large." This continued in force, and the second section was intended to qualify it by restricting the selection to such jurors drawn from the box as were resident within five miles of the court-house.

The objection here taken is not to a mere irregularity. It appears upon the record and goes to the substance. The accused was entitled to trial by a jury drawn, summoned and impaneled according to law.

The law is familiar and the cases are abundant where courts

have interfered thus to protect the integrity of the jury box with
an uncommon strictness.  2 *N. & McC.* 29; 15 *Rich.* 47; 5
*Ired.* 58; 1 *Gr. & Wat.* 171.  The cases in this state make such
ground good in arrest.  2 *Sp.* 216; 1 *Rich.* 189; 15 *Rich.* 47,
*supra;* 15 *Rich.* 42.

In those cases which treat lightly certain irregularities, as they
are termed, in the impaneling of juries, the irregularities were
such as could not by any possibility affect the verdict; and the
cases go off rather on the principle that the objection came too
late after verdict.  2 *McC.* 12.

*Second.* The right to challenge peremptorily two jurors was
denied.

At common law, the right of challenge was carefully guarded,
and for good reasons.  4 *Bla. Com.* \*353; 12 *Whart.* 480; 1
*Bish. on Crim. Pro.*, § 935.  And the courts are compelled to
allow it.  1 *Chit. on Crim. Law* 534; 1 *Denio* 310.  The court
below was possibly misled by hasty reference to decisions under
the act of 1841.  11 *Stat.* 168, and *Gen. Stat.* 522.  The decis-
ions upon this statute are 2 *Sp.* 418 and 2 *Rich.* 191, both civil
cases.  But the wording of the act, as applied to civil and crimi-
nal cases, is very different.  But this act is repealed under the
operation of the act of 1871.  15 *Stat.* 690, §§ 37, 38; *Gen. Stat.*
830.  So much of act of 1841 as relates to civil cases, is re-enac-
ted in General Statutes, § 26, p. 523.  As to criminal cases, it
was not re-enacted; but act of 1871 is, and right to challenge to
the extent of five is given in cases like this.  *p.* 747.

It is clear that such right in cases of misdemeanor was to be
exercised in the same mode as in cases of felony, where it has
always been without restriction, except as to number.

*Third.* There are several defects in the indictment.

1. In indictments for conspiracy, it is necessary, generally,
that either the object or the means be criminal.  1 *Bish. on Crim.
Law*, § 174; *Whart. on Am. Crim. Law*, §§ 2, 291, *and note d;*
*Rosc. Crim. Ev.* 381.  Wharton classifies conspiracies—1. To
commit indictable offences; 2. To effect an object by indictable
means; 3. To affect the community injuriously.  2 *Prec. Ind.*,
*ch.* 11.  The third class is elaborately discussed in 2 *Whart.*

*Prec. Ind.*, bottom, *p.* 97, *et seq.* It has been also recognized in this state. 2 *Hill* 282.

Outside of this third class the definition of a conspiracy is easy. 9 *Cow.* 571; 1 *Cush.* 223; *Whart. on Am. Crim. Law*, §§ 2297 *or to* 2305.

2. A combination to cheat is not criminal, unless the means intended to be employed are criminal; and to be criminal, they must come within the definition and meaning of " a false token or counterfeit letter in another man's name."

This offence is not and could not be included in the third class. It is confessedly referable to the second class, and will be found in 2 *Whart. Prec., No.* 614, following the sanction of *Rex* v. *Gomperty,* 9 *Ad. & El.* 823. See 2 *B. & Ald.* 204. But there was no statute of false pretences in South Carolina in 1874, and hence these cases have no application. 2 *Whart. Prec. Ind.* 93–103. 2 *Hill* 282, *supra,* was a case of the third class, and wholly out of this line.

In this state cheating is confined, as at common law, to a fraud accomplished through a false symbol or token, of a nature against which common prudence cannot guard, and which may affect the public, (1 *Bish. on Crim. Law,* § 571; *Dud.* 275;) or by statute " by color and means of a false token or counterfeit letter in any other man's name." *Gen. Stat.* 717. The terms *cheat* or *cheat and defraud,* do not, of themselves, import a crime; the object and the means must unite to constitute the offence.

3. An indictment for conspiracy to cheat is, therefore, fatally defective, unless it contain the averment of a combination to effect the object by means of " a false token or counterfeit letter in any other man's name;" and of means which, in law, come within the definition of these devices. 2 *Hale P. C.* 169; 1 *Chit. on Crim. Law* 168; 2 *Bail.* 69; *Archb. Crim. Pr.* 41; 4 *Rich.* 194; 3 *McC.* 190; 1 *Bish. on Crim. Proc.,* §§ 508–530; 5 *Barr* 60; 49 *Ind.* 186. The argument is well put in 1 *Cush.* 189; and see 4 *Metc.* 111; 7 *Cush.* 514. The paper in this case may be fraudulent, but in the technical sense of the word *cheat,* it is not *false.* 2 *Bish. on Crim. Law,* §§ 145, 146; 1 *Rich.* 247; *Dud.* 275.

4. The indictment is fatally defective, because the offence, de—

pending upon the character of the means employed, is not set forth with clearness, precision and certainty; and because the means constituting the essential element of the offence charged, are not set out, either in substance or according to the tenor, and by special and specific description as to numbers, dates and other peculiar and distinguishing marks, sufficient to identify the same, and fully, fairly, plainly, substantially and formally to describe the crime for which the defendant is held to answer. *Const.,* *Art. I.,* § 13; *Bish. on Crim. Proc., ch.* 28; *Whart. on Crim. Law,* §§ 285–304; 3 *McC.* 190; 3 *Hill* 63; 1 *Bish. on Crim. Proc.,* §§ 515–520; *Whart. on Crim. Law,* §§ 285, 306, 307, 606–608, 1468, 2068, 2598, *et seq.;* 2 *McC.* 248.

5. The indictment is fatally defective for repugnancy. The state could have been cheated only by deceiving Cardoza, its agent, who is alleged to have had knowledge. 1 *Cush.* 33; 7 *Car. & P.* 352; 4 *Barb.* 151; 14 *Ward.* 546; 1 *Rich.* 244, 247; 2 *Mill* 135; 2 *Bish. on Crim. Law,* §§ 144–146.

Errors were committed in the admission of evidence.

Entries of a partnership were introduced without any proof of the death or absence from the state of the clerks who made them; and entries in a book were read by a witness, made by himself in phonographic characters, capable of being translated only by himself.

See remarks of Marshall, C. J., in 7 *Cranch* 290, 295. Entries may be proven only when made in ordinary course of business. 2 *Brev.* 156; 4 *McC.* 76; 2 *McM.* 306; 1 *Strob.* 135; 2 *N. & McC.* 436; 2 *Speers* 284; 1 *Rich.* 223; 2 *Hill* 584; 1 *Bay* 33; 2 *Hill* 677; 4 *Strob.* 193; 2 *Phil. on Ev.* (*C. & H.'s notes*) 754. These entries must be established by the oath of the party making them. 2 *McC.* 157. Nothing but death can excuse the absence of the clerk who made the entry. 4 *McC.* 257; *Hill & Cow. notes to* 2 *Phil. on Ev.* 694. This privilege of proving entries cannot be extended to strangers to the entry; and as a charge against one, it must be brought home to his knowledge. 1 *Sm. Lead. Cas.* (6 *Am. ed.*) *392, *394; 1 *N. & McC.* 131; 2 *Id.* 19; 2 *Wheat.* 117, *and note;* 1 *Phil. on Ev.* 320; 2 *Id.* 674–679, *note* 489 *to p.* 265; *and note* 432 *to p.* 558. A witness may be permitted to refresh his memory by

memoranda, but the memoranda themselves are not evidence. 1 *Greenl. on Ev.*, § 437; 2 *Phil. on Ev.* 421, 528; 1 *Whart. on Ev.*, §§ 516–526; *Ros. Crim. Ev.* 134; 2 *C. & P.* 603; 3 *T. R.* 749; *State* v. *Rawls*, 2 *N. & McC.* 331; 1 *Rich.* 234. As to the kind of memoranda which may be used, see 1 *Sm. Lead. Cas.* *402; 1 *Mill* 336; 5 *Wend.* 301; 1 *Barb.* 535. But it must be the original, not a copy. 1 *Rich.* 234, *supra;* 2 *C. & P.* 196; 2 *Whart. on Ev.*, § 578; 2 *Phil. on Ev.* 756. A translation is no better than a copy; the courts will never extend the rule. More-over, the memoranda refer to matters subsequent to the conspir-acy, and are, therefore, inadmissible. *Whart. on Ev.*, § 1206.

Evidence was admitted of distinct matters wholly irrelevant to and disconnected with the issues of the case. 2 *Russ., by Graves,* 772. A witness may not be questioned concerning an irrelevant fact, with a view to discredit or contradict. 1 *Phil. on Ev.* 210; 7 *East.* 108; 2 *McC.* 230.

Entries made in the Republican printing company's books were admitted as declarations of Jones and Woodruff. Facts which are regarded as confirmation of an accomplice, should be wholly independent of his testimony. 2 *Stark. on Ev.* 233, *et seq.;* 1 *Bish. on Crim. Proc.*, § 1081, *and notes;* 2 *Archb.* *662; 3 *Phil. on Ev.* 1504.

The court refused the eighth instruction to the jury, asked for by defendant. It should have been charged in whole or in part. 1 *Bish. on Crim. Proc.*, § 980.

*Mr. C. R. Miles*, contra.

*Motion in Arrest of Judgment.*—Of the seven grounds taken on this motion, the first and seventh relate to the jury, and the other five to the indictment.

*The Jury.*—1. The jury were drawn in conformity with the law as declared by act of June 8th, 1877—16 *Stat.* 259. See §§ 2, 4. The fifth section repeals all acts and parts of acts which are inconsistent with this. Before that, supernumeraries were drawn under Section 19 of act of 1871 (*Gen. Stat.* 522, § 23), but the act of 1877 declared that no jurors should be summoned from the bystanders: so that they could be drawn in this case only under act of 1877.

1(*a*). The defendant objects that he was not allowed to challenge peremptorily the jurors called to take the place of the other jurors challenged by the state.

The jury act of 1871 (14 *Stat.* 692; *Gen. Stat.* 522) does not apply to the impaneling of juries in criminal cases: that must be according to the established practice. *Sec.* 19, *Act of* 1871. Under this act the defendant was entitled to five challenges, and the state to two. Previous to 1856, the established practice in making up a jury for the trial of one entitled to challenges, was to call the names of jury No. 1, beginning with the foreman, next jury No. 2, in the same way, and then the names of supernumeraries were drawn from a box. 3 *Strob.* 508, recognized in 10 *Rich.* 412. Then followed the rule of court (No. 97) for drawing in cases of felony (10 *Rich.* 549), which was sustained in 10 *Rich.* 351, 407, and 11 *Rich.* 581. The same rule was adopted in 1870, as Rule 26. This indictment not being for felony, the rule of court does not apply.

The right of challenge to jurors was extended to misdemeanors and civil causes by act of 1841. 11 *Stat.* 154. This act has been construed in civil cases. 2 *Speer* 418; 2 *Rich.* 191. The course pursued in this case was thus conformable to principle and practice.

*The 7th ground in arrest of judgment* is based on matter not appearing on the record, and came too late after verdict; the objection should have been taken by plea, before the grand jury at the trial term had been discharged, in analogy to the plea of misnomer, so that if sustained a new indictment might have been given out. But the objection is disposed of by statute—see *Sec.* 28, *Gen. Stat.* 570—showing that special sessions may be held for special cases; and *Sec.* 10, *Gen. Stat.* 520, showing that there may be special sessions not requiring a jury.

*The Indictment.*—The five other grounds for the motion in arrest of judgment allege defects in the indictment. We take issue with appellant on each and every of these propositions, and submit—

1. That this indictment does sufficiently charge a conspiracy to cheat by a false token or counterfeit letter.

2. That an indictment lies in this state for cheating by means other than a false token or counterfeit letter.

3. That indictment lies for a conspiracy to do an illegal act which is not indictable.

4. That the deception in this case consisted in the false and fraudulent official representation that the state was indebted to C. L. Frankfort, and drawing a certificate therefor in the form of a public certificate or voucher, as prescribed by law, which was calculated to deceive the public, and did actually deceive the officer of the treasury who paid it.

5. That the means are fully and sufficiently alleged in the indictment; but that it is not necessary to set forth the means.

1. Even if it was necessary to charge the conspiracy to cheat to have been by means which would sustain an indictment to cheat by a false token or counterfeit letter in another man's name, this indictment would be sufficient. The legislative pay-certificate was "a false public token," and the fictitious endorsement of C. L. Frankfort constituted "a counterfeit letter." 2 *East P. C.* 383, 832, 833; 1 *Bish. on Crim. Law,* § 571; 2 *Id.,* § 543; 1 *Rich.* 244; 4 *East* 164. If the indictment *shows* the instrument to be a false token, it is not necessary to *aver* it. *Cro. Car.* 564; 3 *Chit. on Crim. Law* 199; 2 *East P. C.* 838; 2 *Archb. C. P. & P.* 1421.

2. An indictment lies in this state for cheating by means other than a false token, &c. See act of 1791—5 *Stat.* 177, and *Gen. Stat.* 719. 5 *Strob.* 159; 1 *Bay* 353; *Dud.* 275; 2 *Mill* 138.

3. An indictment lies to do an act which is not indictable. A conspiracy is a confederacy of two or more persons to accomplish some unlawful purpose, or a lawful purpose by unlawful means. 2 *Bish. on Crim. Law,* §§ 171, 175, *and note, and* 180; *L. R. C. C.* 274; 5 *Har. & J.* 317.

4. In an indictment for conspiracy to cheat, it is not necessary to allege or prove an actual deception; but only that the means used were calculated to deceive.

Although the defendant was not deceived, he was not the state, and the state was actually defrauded. 2 *Arch. C. P. & P.*

[618], *note;* 5 *Har. & J.* 317 ; 2 *Bish. on Crim. Law,* § 175, *note.*

5. The indictment is drawn in conformity with the precedents of highest authority.

1 *Chit. on Crim. Law,* 1145, 1185 ; 2 *Whart. Prec., ch.* 11, *p.* 606 ; 2 *Archb. C. P. & P.* [618.] The indictment was drawn in accordance with the advice of Wharton. 2 *Whart. on Am. Crim. Law,* § 2297, (*a*) ; *Whart. Prec.* (*1st ed.*) 339, 340. An indictment merely averring that "defendants conspired by divers false pretences and indirect means to cheat and defraud" is sufficient. It is not necessary to insert overt acts—the conspiring is the offence, and the overt acts are merely matter of evidence to prove the charge. 1 *Leach* 274; 2 *B. & Ad.* 204, *the leading case;* 7 *Ad. & El.* (*N. S.*) 721 ; 9 *Id.* 824. For the history and discussion of the decisions, English and American, see, 2 *Archb. C. P. & P.* [616], *and notes;* 3 *Whart. on Am. Crim. Law,* §§ 2299–2305, 2335 ; 2 *Bish. on Crim. Law, ch. XI.,* § 199–201 ; 4 *Wend.* 232 ; 5 *Har. & J.* 317 ; *Whart. Prec. of Ind.* 33. The only cases of conspiracy in the South Carolina reports are 2 *Hill* 282 ; 4 *Strob.* 266 ; 8 *Rich.* 72 ; 7 *S. C.* 283.

The judge did not err in refusing defendant's second request to charge. 3 *Whart. on Am. Crim. Law,* § 2339 ; 2 *Bish. on Crim. Law,* § 188.

*Motion for New Trial.*—1. The evidence of the declarations of Gleaves and Jones was not admitted until after proof of the conspiracy. There is no rule which requires the conspiracy to be first proved by evidence other than that of an accomplice. 1 *Greenl. on Ev.,* § 111.

2. The diary of Woodruff was used only to refresh his own memory, and it mattered not that it was in language or characters which the court or jury could not read. 1 *Greenl. on Ev.* 437.

3. Entries in the Republican printing company's books were independent facts, which corroborated the evidence of Lee and Woodruff, that the conspiracy was to be carried out by exchanging the Frankfort certificate with Cardoza for certificates of indebtedness of the Republican printing company, and evidence of

them was therefore admissible. 1 *Greenl. on Ev.*, § 120; 2 *Whart. on Ev.* 1206.

4. The report of Woodruff's evidence is inaccurate. The judge submitted it to the jury to say whether the initials and other circumstances showed that this entry related to the conspiracy.

5. The statement made up by the business manager from the books of the company was a fact in corroboration, and admissible. Besides, no objection was made to the production of the paper.

6. The Christopher and other certificates were properly admitted in contradiction of the defence attempted to be set up upon the subject of the Merriam certificate. 1 *Whart. on Crim. Law*, § 649; 1 *Greenl. on Ev.*, § 53; 1 *Whart. on Am. Crim. Law*, § 631; 2 *Tread.* 776; 1 *Bail.* 300; 3 *Whart. on Am. Crim. Law*, § 2358. And it was not objected to.

7, 8, 9, 10 and 11 are sufficiently answered by the rulings of the judge. We submit that the rulings of the judge upon all material points were correct.

13. The judge charged this instruction as asked.

The instructions prayed all relate to the testimony of accomplices and its corroboration. Upon this subject see 1 *Greenl. on Ev.*, § 379, *et seq;* 1 *Archb. C. P. & P.* 154; 3 *Strob.* 517; *Id. note; Joy on Ev. Accom.* 98, *cited* 1 *Greenl.*, § 381, *note;* 2 *Russ. on Cr.* 330; 3 *Strob.* 519–21, 526.

November 29th, 1878. The opinion of the court was delivered by

WILLARD, C. J. · It has been so often held that this court cannot set aside the verdict of a jury in a case in the nature of an action at law or in a criminal case, on the ground that the verdict was against the evidence, or unsupported by it, that it is not necessary to consider that portion of the appeal that makes such a demand, farther than to say that it is not competent for this court to say, on appeal in such a case, that a discrepancy between the evidence and the verdict based upon it, is so great as to warrant the inference that the jury were influenced by improper consideration. The proper place to examine questions of that nature is at the Circuit, and the decision of the Circuit Court,

so long as no error of law is committed by it, is final and con-
clusive.

The first point to be considered relates to the regularity of the
drawing and impaneling of the petit jury.    Section two of the
act of June 8th, 1877, (16 *Stat.* 259), provides that "when, by
reason of challenge or otherwise, there is a deficiency in the num-
ber of grand or petit jurors duly drawn and summoned at any
term of the court in any county of the state, the judge of the
Circuit Court shall order the board of jury commissioners, or a
majority thereof, forthwith to attend in court and to draw, in the
presence and under the direction of the court, such number of
jurors as the court shall deem necessary to fill such deficiency;
the jurors so drawn to reside within five miles of the court-house."
It is conceded that such a case of deficiency arose in the present
case, and that a majority of the jury commissioners, under the
direction and in the presence of the court, drew from among the
names of such persons as the law contemplated for that purpose,
the number required to supply such deficiency.    It is not alleged
that the names from which such drawing was made included any
that did not properly belong there, or excluded any that should
have been subjected to such drawing.

The objection is that the names drawn were contained in a
compartment of the box separate from that which contained the
names of the jurors from the county at large, and that such names
were not selected and placed in such compartment by the author-
ity of law.    It must be assumed, though not distinctly stated,
that the selection of the names from those of the jurors at large
was made by the jury commissioners, and such names placed by
them in the compartment of the box from which the drawing
was made, inasmuch as to allow that selection and interference
with the jury box by an unauthorized person, would be a breach
of official duty on the part of the jury commissioners that cannot
be presumed.    It is not stated when the names of such jurors
were placed in the partition from which the drawing was made,
the only statement of irregularity being that it was done "long
after a proper and legal list of jurors had been prepared for this
county for the year 1877."    We are at liberty to assume that
such selection and transfer to the separate compartment was made

by the jury commissioners in the presence of the court for the purposes of such drawing. The proposition on which the appel-‘ lant relies is, that there was no authority of law for the selection and removal of the names of the jurors residing within five miles of the court-house from the other names of jurors into a separate compartment of the box and making the drawing therefrom. It is contended that the only authority for such an act is that contained in the fourth section of the act of June 8th, 1877, which contains as follows: "When the jury lists are prepared by the jury commissioners for each year, they shall place in a separate apartment in the jury box the names of fifty persons, qualified by law to serve as jurors, who reside within five miles of the court-house, from which shall be drawn the jurors to supply the deficiencies provided for in the second section of this act." By this section the number to be so placed for the county of Richland is fixed at one hundred. It is also contended that as the jury lists in question were prepared prior to the passage of the act of June 8th, 1877, no opportunity ever existed for the exercise of the power conferred by section four. No question is made here as it regards the number of names placed in the separate compartment. It is not stated that such number was in excess of one hundred, the number provided for in section four, nor that it was less than that number. Had the whole number of names of persons liable to jury duty residing within five miles of the court-house exceeded one hundred, and had the jury commissioners, at the time of drawing, confined the drawing to a less number than that of the whole number of persons having the qualifications indicated by the statute, a question might have been presented here, whether such a rejection from the drawing of the names in excess of one hundred could be made at any other time or in any other manner than that pointed out by the law. But as it neither appears that names of jurors residing within five miles of the court-house were excluded, nor the number of one hundred exceeded, no such question arises for consideration.

We cannot assent to the proposition that the action of the jury commissioners had no other sanction than that of section four of the act mentioned. Assuming that the jury commissioners, when called upon to draw from the persons residing within five miles

of the court-house the names of a certain number to supply deficiencies, found that no such discrimination among the names in the box had been made, as it was essential to the discharge of the duty imperatively imposed upon them by section two of the act, that such a discrimination should be made, they had clear implied authority to make it. Whether they selected in the first instance from the whole number of the names in the box those subject to the drawing to supply deficiencies, and from among such made the drawing, or drew from the box at large, rejecting such as were not subject to such drawing as their names were drawn, is entirely immaterial. The difference between the two modes of procedure is formal and not substantial, and, as in case of a drawing at such time and place, form is not made material by the statute, we can only look to the substance of the act. *State* v. *Jennings*, 15 *Rich.* 42, for this reason, does not apply to the case in hand. It is matter of indifference whether a previous opportunity for making such selection had been afforded by the law and neglected, or had not been afforded, the duty of selection was equally inoperative. The jury commissioners were not performing an act for their own benefit, permitted to them on conditions, but an act essential to the administration of justice, and every intendment must be made in favor of the sufficiency of their authority.

There was not, in any legal sense, an irregularity, as affecting the legal results of the drawing, and therefore it is not necessary to examine the authorities cited by the appellant bearing on the question of what irregularities in the drawing and impaneling of juries are fatal. The exception to the drawing and impaneling of the jury was not well taken.

The next exception to be considered affirms that, upon the trial, the court denied the accused the right of peremptory challenge as allowed by law. The defendant was entitled to five peremptory challenges. *Gen. Stat.* 747, § 3. He claimed the right to challenge four of the persons drawn and returned as petit jurors. His challenge was allowed as to two of the jurors and disallowed as to the other two. The consequence was that the jury by whom he was tried included two to whom he had peremptorily objected, notwithstanding the whole number of chal-

lenges allowed by law had not been exhausted at the time of the attempted challenge.

The ground on which such exclusion is defended is that the two persons who were permitted to sit as jurors, notwithstanding such peremptory challenge, had been drawn from the supernumerary list to supply the places of two others who belonged to jury No. 1 who had been excluded by challenges. This virtually confines the right of challenge in criminal cases so as to affect only the persons placed in one of the juries organized for the trial of civil causes. It assumes that other persons drawn and impaneled are not to be excluded, whatever objection may exist in the mind of the accused, to their occupying that relation to him.

It is too clear to admit of doubt that the right of the accused to challenge any five of the persons drawn and returned as jurors could not be affected by the peculiar constitution of the regular juries and the supernumerary list for the trial of civil causes. In the first place, there must be a new jury impaneled in each criminal case. *Gen. Stat.* 747, § 8. The direct and intended effect of this section is to make the selection of jurors in criminal cases depend wholly on the results of a drawing in open court, in the presence of the accused, from the whole number of persons serving as jurors. The occasions of its adoption were that a different rule prevailed in civil causes. In the last-named case parties were required to take a standing panel, deficiencies arising to be supplied from the list of supernumeraries.

Accordingly in presenting to the accused in the present case jury No. 1, only competent for the trial of civil causes, for his peremptory challenges, it was assumed that the jury thus constituted was competent to try the case. Such was not the fact independently of the assent thereto of the accused. It is true that the appeal does not present to us any objection to the mode in which the jury was impaneled other than that of the disallowance of the challenges, and therefore we are not called upon to say that there was error in constituting the jury otherwise than by a new drawing; but upon the question of the right of peremptory challenge, this consideration cannot be decisive. It may well be that the accused was content to waive a new draw-

ing, but he has evinced no intention to waive the right of peremptory challenge and its proper incidents. The right of peremptory challenge is not a formal right merely, but substantial and vital to the proper administration of criminal justice. The fact that the accused was willing to waive any advantages that might arise from an impartial drawing in his presence is no ground to assume that he intended to waive objection to the sitting of persons whom he considered unfit, for reasons satisfactory to himself, to sit as jurors in a matter affecting him. The state could not well insist that one concession should embrace the other, because they were not necessarily connected or dependent on each other.

If the state and the accused should agree together that the jury should be impaneled in alphabetical order, or in any other way that might mutually suit them, while it is not for the court to deny them that right, still we cannot travel beyond the terms of their concession and make out a new law for the case, composed in part of rules governing civil procedure and in part of the rules applicable to criminal proceedings.

On the contrary, the right of challenge being a distinct and substantive one, must be deemed unaffected by such concession, and must be administered in the mode prescribed by the law applicable to the case. *Charleston* v. *Kleinback,* 2 *Spears* 418. The method of drawing jurors in civil cases is stated and distinguished from the mode of drawing in criminal cases in this case. It was material that such distinction should be pointed out, as it was a *qui tam* action and had to be referred to either the one class or the other. It was held to appertain to the class of civil causes.

The principal question in the case appears to have been whether the plaintiff could challenge peremptorily unless that right was fully exercised before the defendant was called upon to make his peremptory challenges. It was held that where in civil causes it was necessary to have recourse to supernumeraries they were considered as talesmen, and that if either party desired to exercise the right of challenge there should be a new drawing among such persons. This undoubtedly implies that the right of peremptory challenge might be exercised against persons on the

supernumerary list. The object of redrawing was to prevent the party intending to challenge peremptorily from virtually selecting a jury by means of his challenges, as he might to some extent do if the supernumeraries were called in their order on the list, that order being known to the party intending to challenge. Whatever may be considered the ruling of this case, it is in terms confined in its application to civil causes.

*Durant* v. *Ashmore*, 2 *Rich.* 184. In this case O'Neall, J., says : " After jurors have been challenged and others have been drawn in their places, neither party can, under the act of the legislature, challenge the jurors so drawn." *State* v. *Kleinback*, 2 *Spears* 418. It is to be presumed from the error in this citation that it was made from general recollection.

The report of the case of *Charleston* v. *Kleinback*, which it is presumed is the case to which reference was here intended, does not appear to go to the extent or even in the direction claimed for it. However this may be, both were civil causes, and the rule laid down must be confined to such causes. Although the distinction is not clearly drawn in *Durant* v. *Ashmore*, independently of the nature of the case itself, yet what is there said is so said on the authority of *Charleston* v. *Kleinback*, and the latter case pointedly enforces such distinction. It is not necessary to consider the rule stated in *Durant* v. *Ashmore* in its application to civil causes, but clearly it has no application to criminal causes. Whatever may have been the proper construction of the act of 1841, (11 *Stat.* 154,) that act is inapplicable to criminal cases at the present time, the right of peremptory challenge being governed at the present time by the General Statutes, § 3, p. 747. By the terms of the present law no limitation, except as to number, is imposed upon challenges in criminal cases.

As it regards the crimes of murder, manslaughter, burglary, arson, rape and grand larceny, reference is made to pre-existing laws in the following words : " In the manner prescribed by law ;" but these words are not used in the subsequent part of the section that relates to the right of peremptory challenge in all other criminal cases.

It must be concluded, therefore, that the right as conferred by the General Statutes in cases other than those specifically enumer-

ated above, was intended to be complete as thus quoted without dependence on any preceding statute of limitation, and to be interpreted only in the light of the rules of law applicable to the subject. It must be concluded that the challenges were improperly refused.

The appellant alleges that the indictment is defective, "in that the statement of the offence charged does not contain an averment of a conspiracy to cheat by means of false tokens or a counterfeit letter in another man's name."

This is connected with the next objection, to the effect "that the averment of the purpose and object of the conspiracy charged does not import a crime under the laws of this state." If the latter proposition is unfounded, the first stated is immaterial. The precise question, then, is whether a charge of conspiracy against a public officer and others conspiring with him, with intent to cheat and defraud the state, as it regards matters appertaining to the duties of such public officer, imports a crime by the laws of this state independent of an averment of the employment for that purpose of a " false token or a counterfeit letter in another man's name." This is a much narrower question than that discussed at bar, but includes all that need be considered in the present connection. In considering what may or may not be regarded as an indictable conspiracy, the question must be asked whether the object of the conspiracy was to injure the public or private individual. If it was to injure the public, then the public has a direct interest, either residing in the community at large or in the state as a corporate body ; if to injure an individual, then the public has an indirect interest only, as concerned in the maintenance of order, the administration of justice, and the like. As an indictment is, in its nature, one of the modes of redressing public wrongs, it is material to inquire whether the wrong alleged in its direct and primary intent tended to the public injury, or became such only through the intervention of statutes and rules of law, defining what private injuries should be regarded as detrimental to the public.

A conspiracy to injure or defraud the public is indictable as such, independent of the special character of the means employed for that purpose.

This will be found abundantly supported by the authorities. The authorities are uniform that a conspiracy to injure or defraud the public is indictable at common law. Johnston, J., in *State* v. *De Witt*, 2 *Hill* 282, correctly says : " All agree that a combination to do a public mischief is indictable." He instances the cases of injuries to health, vending unwholesome food, manufacturing base articles for public sale, imitating good ones, and to defraud the revenue.

All the counts of the indictment charge a conspiracy of the defendant, as state treasurer, with divers persons, to cheat and defraud the state out of a large sum of money. If, therefore, the charge is sufficiently full and clear, there can be no doubt but that it sets forth an indictable offence. It is contended, however, that, independently of a statement that such conspiracy to defraud was intended to be carried out by the use of a " false token or counterfeit letter in another man's name," the facts charged do not constitute a crime. This argument ignores the important distinction between acts tending directly to the public injury and acts primarily affecting individuals, made criminal only as they affect the administration of justice, or as they are to be accomplished by means of false tokens and pretences. The causes illustrating this distinction are numerous. *State* v. *De Witt*, 2 *Hill* 282, and *State* v. *Shooter*, 8 *Rich.* 72, are cases of this class. In the first-named case the act in question was the destruction of a deed, while the latter case was one of the attempt to fabricate evidence by procuring a deed through false pretences. In both the inquiry intended primarily affected individuals alone, but became indictable through the fact that the creature of false testimony and the destruction of true testimony, tended to injure and impair the administration of justice.

In *Lambert* v. *People*, 9 *Cow.* 578, Senator Spencer, who delivered the leading opinion, holds that an indictment will not lie for a conspiracy to produce a private injury, " which is not a crime in itself, and does not affect the public or obstruct further justice." If the question is as to the character of the conspiracy, as judged by the nature of its object, this statement is free from objection. The mere fact of intending to cheat or defraud an individual is not, in itself, criminal, whether on the part of one

or many. When it becomes criminal it is through the means intended to produce such effect. A false token and counterfeit letter are means of that character. A false token and counterfeit letter are things that may affect others than the immediate object of the cheat; they may be capable, to some extent, of maintaining a credit with the public. A forged note or bill, receipt or letter, attired so that it may become detrimental to the community at large, is a clearly recognized injury to the public. It is not distinguishable from the case of spurious goods offered for public sale, in principle. *State* v. *Rickey*, 9 *N. J.* 293. This subject is fully discussed and the authorities reviewed at large in this case. It is conceded that when the injury is against the public the conspiracy is indictable; but that when the injury is intended to an individual only, it is not indictable, unless the means employed are criminal.

The objection of appellant, that the certificate referred to in the indictment is not in law " a false token or a counterfeit letter in another man's name," is disposed of by what has already been said.

It is alleged that the indictment is defective, for the reason that the acts charged against the defendant are repugnant and contradictory. This is connected with the further statement that the defendant is charged with having conspired to cheat the state by means which were not calculated to deceive, and not such as could deceive the defendant, as the officer of the state charged with the performance of the act necessary to the consummation of the offence.

The first, second and third counts of the indictment allege the means by which it was intended that the state should be defrauded, namely, by a forged pay-certificate, representing that a fictitious person was entitled to payment on account of an appropriation to pay legislative expenses, attested by the officers of the legislative bodies authorized by law to attest demands of that nature. If there had been such person as C. L. Frankfort, and the state had been indebted in the manner stated in that certificate, then it would have been the duty of the defendant, as state treasurer, to have paid such certificate in such manner as might be provided by law. On such payment being made, in the due

course of his duty at that time, such certificate would have been retained in the treasury as a voucher for such payment, and on its production it would have appeared that such payment had been properly made.

The substance of the appellant's objection is, that a false voucher by a disbursing officer, in order to cover the unlawful abstraction of funds in his hands, is not so to be regarded as a means of deception. Possibly it may be that it does not come up to the conception of a false token as essential for the foundation of a criminal charge in the case of an attempt to cheat a private person, when it was not intended, or of a nature to be so placed that the community at large might be affected by it as a means of obtaining credit; but as to this we are not called upon to decide. That such a means of covering a delinquency is not repugnant or contradictory to the idea of deception, is too clear to admit of argument. To manufacture a false voucher for the payment of money is of the very essence of deception.

The next objection to be considered is, " that the indictment is fatally defective in that the offence charged is not set forth and stated with sufficient clearness and certainty ; that the means by which it is alleged therein the offence was intended to be and was consummated, are not set out either in substance or according to the tenor thereof; that the warrant or pay-certificate described as the said means, is not set out with sufficient precision and certainty, and by such special and specific description as to numbers, date and other peculiar and distinguishing marks, as to identify the charge, and fully, fairly, substantially and formally to describe to the defendant the crime for which he is held to answer." It will be considered with reference to the fourth count whether a specification of the means intended for the consummation of the fraud alleged is essential to an indictment of this character. As it regards the first, second and third counts, the state has assumed to set out such means, and assuming such a statement to be necessary, it is clear that even the stringent rule claimed for the appellant has been complied with. The character of " the pay-certificate " is described as a warrant on the state treasurer for a sum certain on account of legislative expenses; the name of the fictitious person to be employed is stated ; the persons to sign and

attest the certificate are stated. The crime was consummated when the parties to the transaction agreed together as to the purpose of defrauding the state, although the intended injury remained to be consummated. If the conspiracy had related to an instrument existing prior to the time of such conspiracy, there might be a propriety in pointing out the instrument intended by indubitable marks. Had this been the case, the identification afforded by the description in the indictment would still have to be regarded as complete. There would be no reason to assume that more than one such certificate as that described in the indictment existed rendering further specification necessary to identification. But as the conspiracy had for its object the production of such a certificate, all that could be averred with propriety was. what the conspirators may have agreed concerning it. If numbers, names and marks subsequently put on the paper were not then in contemplation of the parties as material features of the .certificate, they could not properly be alleged as comprehended in the direct objects and intents of the conspiracy. Looking at these three counts in the light of the charges in the indictment alone, this court cannot say that more nor less than is stated was comprehended in the terms and intention of the agreement of conspiracy.

The objection here is to the indictment and not to the character and sufficiency of the proof under it, and, looking at the indictment alone, we cannot affirm that anything is wanting that we have a right to assume as existing and forming part of the scheme of conspiracy. The crime charged is fairly, substantially and formally described, so that no possible doubt could exist in the mind of the defendant as to the nature of that for which he was held to answer. As it regards the fourth count, the objection assumes a different character.

This count charges that the persons indicted, on a certain day unlawfully, falsely, fraudulently and corruptly did conspire, combine, confederate and agree together, by divers false pretences and indirect means, to cheat and defraud the State of South Carolina of a large sum of money, to wit, "the sum of four thousand dollars, to the great damage," &c.

This count affirms two things. *First.* An unlawful conspiracy

to defraud the state out of a certain sum of money. *Second.* That the means of accomplishing it was to be by false pretences and indirect means.

Now, assuming that this was all that was agreed upon among the conspirators, an assumption that we are bound to make for the purpose of considering this count, did such act amount to an indictable offence?

That such an act of conspiracy is indictable, the authorities afford abundant means of establishing; but there are not wanting sufficient reasons why the common law, that seeks to afford a public remedy for every public wrong, should furnish the means of punishing such a conspiracy. To illustrate the principle involved, suppose that a conspiracy had been formed to rob on the highways, but no person had been designated as the special subject of such robbery, and no definite place or means of overpowering the victims of the plot formed part of the agreement of conspiracy. Money and arms are collected to carry out the conspiracy, the band is divided, distributed and posted, some for purposes of direct attack, others to watch against surprise, and others to reinforce a weak party. No action has yet appeared to put in exercise the formidable combination of force and skill. At this stage of the operation the parties are arrested and charged with a conspiracy to rob. Must the charge fail because the terms of the conspiracy did not embrace circumstances of time, place and person, as it regarded the accomplishment of its purpose? If so, then it would not be possible, even after the plan had been carried out, to punish the conspiracy, for, in the first place, the crime was consummated, if at all, at the moment the agreement was made, and if conviction in any such case could not take place prior to the actual commission of the intended crime, it was because no crime had been committed, nor could the character of the conspiracy in that respect undergo any change after it was consummated by an unlawful agreement. In the second place, the moment the right to punish the conspiracy arose it would be destroyed by merger in the offence of higher grade flowing from it. It would be a just reproach to the common law if it afforded no means of dissipating combinations threatening the destruction of legal security, however formidable

they might be, because the objects were general and threatened the community indefinitely, and were not aimed at some particular member of the community, or to some other limited and defined sphere. On the contrary, as we have seen, one of the great objects of this jurisdiction is to protect the community at large; and the protection of the individual is subordinate to that end.

. The principle just illustrated applies with equal force but under altered circumstances in the case under consideration. Here the protection demanded is for the public property of the state, and those who confessedly violate the law by conspiracy to obtain unlawful possession of such property ought not to be permitted to shield themselves by saying that the object of their conspiracy was to lay hold of any property of the state they could reach by any means, and not to appropriate any designated piece of property by predetermined means. Yet this is the position the defendant must assume in order to ask that the fourth count may be adjudged bad. The question must be brought to the test of the authorities which will now be considered.

*King* v. *Ecles*, 3 *Doug.* 336. This was an indictment for a conspiracy to impoverish " H. B." and to deprive and hinder him from following and exercising his aforesaid business of a tailor. It was moved in arrest that the charge was general. It was held that it was not necessary to state the means, as the end was well stated. It is clear that the court regarded the conspiracy as indictable in respect of its object alone, and therefore a statement of the means was not essential to the description of the offence. It is not necessary to examine the assumption on which the conclusion rested, as the conclusion itself is clear that it is not essential in order that a conspiracy should be indictable that the means should be predetermined. *Rex* v. *Gill*, 2 *B. & Ald.* 204. This case is to the same effect, and the remarks made in regard to *King* v. *Ecles* are applicable to it. *King* v. *Turner*, 13 *East* 123. Lord Ellenborough, in this case, says of *King* v. *Ecles*, that it " was considered as a conspiracy in restraint of trade, and so far as a conspiracy to do an unlawful act affecting the public." He distinguishes the case in hand as an indictment

for a conspiracy "to commit a civil trespass," and as such not criminal.

Considering *King* v. *Ecles* in the light of this case, it must be regarded as holding broadly that a conspiracy to do an injury to the public is indictable independent of any agreement as to the precise means by which it is to be carried out. *Lambert* v. *People,* 9 *Cow.* 578. The indictment here was for conspiracy to cheat a company. The statement of the means was general, as that the defendant agreed, by "indirect and unlawful means," to cheat and defraud such company. It was held that the indictment was bad, but solely on the ground that the act of wrong was against a private person, and in such case an allegation of a false token was indispensable. The reasons assigned for the judgment rest on the idea that a statement of the means is not essential when the act intended to be performed is a crime or an injury to the public. *Commonwealth* v. *Prius*, 9 *Gray* 127. The question in this case is identical in principle with *Lambert* v. *People* and received the same solution. *State* v. *Rickey*, 9 *N. J.* 293. The conspiracy in this case was to defraud a bank. It was held that the bank was to be regarded as a private person, and that the indictment did not charge a crime. The same concession is made in this case as in *Lambert* v. *People*, that a conspiracy to cheat the public is indictable as such without regard to the nature of the means intended for that purpose. *State* v. *Mayberry*, 48 *Maine* 218. The conspiracy was to obtain possession of securities by false pretences from private persons. It was held that such a conspiracy was not indictable independently of the means by which it was intended that it should be consummated. Rice, J., says: "When the act to be accomplished is itself criminal or unlawful, it is not necessary to set out in the indictment the means by which it is to be accomplished." This is a clear recognition of the rule in question although it does not allude to that feature of the rule that places attempts to defraud the public as within the class indictable in themselves. The case did not suggest so full a statement of the cases to which the rule applied, but holding it as principle it must be regarded as a clear authority, as it regards all the consequences resulting from the application of the rule.

*Commonwealth* v. *Shedd,* 7 *Cush.* 514. Dewey, J., holds " that a general allegation that two or more persons conspired to effect an object criminal in itself, or to commit a misdemeanor, or a felony, is quite sufficient, although the indictment omits all charges of the particular means used."

It is clear on the authorities as in reason that charging a conspiracy to defraud the state, as it regards its property or revenue, is indictable as such, although no agreement as to the definite means to be employed for that purpose is alleged. The appellant's exceptions, based on the supposed insufficiency of the indictmet, should be overruled. The appellant's exception, alleging that the Court of General Sessions, at which the indictment was found, was not duly and legally convened, because no petit jury was summoned or in attendance, is bad. To hold that would be equivalent to holding that if for any reason the *venire* for petit jurors or its return to the court fails, the court is without legal power to proceed with its business, a proposition so obviously unfounded that it does not need particular consideration.

The grounds of appeal urged for a new trial will next be considered. The first is that the court erred in admitting evidence of the declarations of R. H. Gleaves and A. O. Jones, as conspirators, not made in the presence of the defendant before evidence other than that of an accomplice had been introduced to connect A. O. Jones with the conspiracy, as charged in the indictment. Counsel for appellant has not pointed out in his argument one exception on which this ground of appeal rests, and none has been found resting on the precise ground advanced. Even on the assumption that corroborating evidence was necessary, and that evidence of acts done and declarations made by the conspirators in pursuance of the conspiracy, had been offered and duly objected to on the ground that the testimony corroborating the evidence of the defendant's accomplice had not been offered and it had been admitted, that would not constitute an error.

It would involve a question of the order of proofs under the control of the court. When proof of an independent fact is requisite to entitle a party to the introduction of certain evidence, the admission of such evidence, without demanding such proof, is erroneous. That is not a question of the order of proof merely,

but of the right to make the proof at all. The object of corroboration is to strengthen proofs already adduced, and not primarily to introduce new and independent facts, and as the evidence offered by way of corroboration must go to the jury with the evidence of acts performed and declarations made by the conspirators in pursuance of the conspiracy, the order in which they were introduced cannot be so material to the defendant as to be ground for exception.

The next ground is that the court allowed the witness, Woodruff, " to refresh his memory by reference to a book purporting to be a diary, written in phonographic characters peculiar to the witness, and such as could not be verified by the court, and to admitting the said book in evidence as against this defendant, and allowing entries, said by the witness to be there contained, to be translated and read by the witness to the jury." The case shows that the book in question was referred to solely for the purpose of refreshing the recollection of the witness. The witness, it is true, read from the book, but that is not inconsistent with the use of the book for refreshing his memory; it was, at most, only anticipating what would probably have taken place under cross-examination at the defendant's request had it not been called for by the counsel for the state. Nothing is found warranting the conclusion that the court and jury regarded the book as resorted to for any purpose other than that of refreshing the memory of the witness. To hold the doctrine contended for by the defendant would be to give immunity to witnesses locking up the contents of their memory in entries contrived to be intelligible to themselves only, to which they could always refer for their own advantage, but to which the court would have no access, however important that might be to the ends of justice.

Such a proposition cannot be tolerated unless established by authority that cannot be shaken.

The counsel for appellant produces no case holding that in order to have resort to such memoranda for the purpose of refreshing the memory of a witness, it must appear that such memorandum is made in characters intelligible to the court and jury without the aid of testimony. It must be presumed that no such case can be found, for it would be inconsistent with the

principle of the rule allowing the memory to be refreshed by memoranda made at the time of the transaction to which the inquiry relates. The memorandum must be. the act of the witness and contemporaneously with the event noted, otherwise it would not necessarily be associated with the state of mind that existed when the impression on the memory was made, but, independently of this, it is of no importance, so far as it regards its capability of refreshing the mind of the witness, whether it was written in characters intelligible to the whole community, or in such as were capable of being translated only by the party himself.

The witness could, doubtless, have given the key to the translation of the memorandum and showed how his method of phonography agreed with and differed from each of the systems commonly practiced, and counsel might have required such information on cross-examination. Had he done so the statement of the witness would have gone to the jury, so as to enable them to judge whether the entry was what the witness represented it to be. This is all defendant could properly ask. It is unnecessary to notice in this connection the discussion drawn from the rule of hearsay evidence and the rule governing the introduction of merchants' books as against third parties, as these rules have no application to the present case. It is contended the strength of testimony as refreshed is the clearness and certainty of the recollection of the facts recorded, after having examined the memorandum, and independently of the memorandum itself, and it was the right of the defendant to test this by cross-examination. The only way to get before the jury such legal considerations as should have weight in determining the force of the testimony, was through the charge of the court, which might have been directed to such considerations. This ground of appeal should be overruled.

The next objection to the verdict relates to the admission of entries made in the books of the Republican printing company. It was proved that Woodruff and Jones, two of the conspirators, constituted the Republican printing company. It appears that the books were the business records of Woodruff and Jones. It was claimed that these books contained. memoranda of various

transactions that belonged to the acts done by the conspirators in furtherance of the conspiracy. Among other entries $800 was passed to the credit of Woodruff and the same amount to Jones on February 5th, 1874, the day on which the certificate in question was paid as claimed. It was also claimed that the amount thus paid to Jones and Woodruff corresponded with the amount to which they were entitled under the terms of the arrangement between the conspirators. It was clearly competent that such an entry in the books of Woodruff and Jones should go to the jury as evidence tending to strengthen the testimony connecting them with the conspiracy. The presumption was that the entry was made under their direction, and the way of disproving that presumption lay in one asserting the contrary. The admissibility of the evidence there did not depend on its competency as a declaration of a conspirator to affect his co-conspirator. It was enough to render the testimony competent that it was admissible for any legitimate purpose. This objection is not well taken.

The fourth objection on the motion for a new trial referred to the circumstance that the attention of Woodruff was called to an entry in the books already referred to, and inquiry made as to whether it related to the transactions in question, and which appears to have been negatively answered. The appellant's counsel moved to strike out the evidence, which was refused, but no exception appears to be noted. At all events the counsel for the state had the right to call the attention of the witness to any particular memorandum and inquire if it related to the transaction in question, and it was not competent to strike out what was said in reply thereto. It is no ground to strike out evidence that it fails to amount to proof of what was intended by the party introducing it. It does not appear that the memorandum was claimed or read as affording evidence of the matters noted, but was noticed for the purpose of attracting the attention of the witness to the matters referred to in it. This objection is groundless.

The fifth objection, relating to the admissibility of testimony, is based on a ruling of the court admitting in evidence an account from the books of Woodruff and Jones. Although the court placed its decision admitting such entry on the broad ground

that as a declaration of a co-conspirator, written by a party beyond the jurisdiction of the court, it was admissible, yet it does not appear that the question submitted involved any such question or consideration. The real question appears from the case to have been identical with the exceptions already disposed of, and the conclusion of the court appears to be correct, whatever view may be taken of the proposition submitted in deciding it.

There does not appear on the record any exception to sustain the appellant's sixth objection, as it regards the admission of evidence relating to the Christopher certificate, and therefore that matter cannot be considered.

The seventh objection relates to questions propounded to the defendant by way of cross-examination, alleging that irrelevant matter was gone into, and that cumulative matter material to the issue was offered in reply to the testimony elicited by such cross-examination.

The only exception that appears in the course of the cross-examination of the defendant is to certain evidence called for by the state, and to which the defendant's counsel made objection. The memorandum, as to the decision of the court, is as follows: "The court held the testimony competent, being rendered so by the introduction of the Merriam certificate."

The objection is not to any particular matter of evidence sought to be introduced, but as it is expressed, "to this line of questions." The counsel for the state had called the attention of the defendant, who was undergoing cross-examination, to a class of payments made 'in certificates for legislative expenses, among which was the certificate called the Merriam certificate. This Merriam certificate was first introduced to notice by the counsel for the defendant upon the cross-examination of the witness, Woodruff. The fact with regard to it, as testified to by Woodruff, was that it was drawn as part of a series of certificates to fictitious persons, intended as the means of drawing money from the treasurer for the personal benefit of different state officers, and that the Merriam certificate was for the share of the defendant, Cardoza. Woodruff, in response to the inquiries of the counsel for the defendant, testified that on the presentation of

this certificate of the defendant, he, the defendant, caused it to be torn in pieces. Subsequently, when the defendant was examined-in-chief by his counsel, this certificate was produced, marked " canceled," but not torn, as stated by Woodruff; such evidence being intended to destroy the credibility of the testimony of Woodruff, not confined, however, to the statement of the destruction of the certificate, which appears to have arisen as an incidental circumstance merely. On the cross-examination of the defendant the counsel for the state recurred to this subject, and endeavored to show that certificates of the same class with the Merriam certificate had in fact been paid by the defendant under circumstances that tended to charge him with guilty knowledge of the objects with which they were drawn. It must be fairly considered that the whole subject was opened by the counsel for the defendant by the introduction of the Merriam certificate. It would naturally be concluded, from the conduct of the defendant in the case of the certificate drawn for his own benefit, that he was a party to the frauds of which that formed a part, and thus Woodruff's testimony, as a whole, would be shaken by proof of such part obtained from that witness himself. It must be assumed that this formed part of the object of the counsel for defendant in opening that subject. Such being the case the question of relevancy cannot be considered on the part of the defendant's counsel, who first opened it. The only inquiry is, whether the evidence elicited followed in the line of that introduced by the counsel for the defendant, so that the whole can be considered as a single subject, and it appears very clear that it did. In fact the defendant's counsel limited his objection to the line of proofs, thus drawing attention away from the particular matters involved to the general bearing and tendency of the questions. After having entered upon that line of proof he was not in a position to object to its continuance in the same direction by the opposite side, so long as a new subject was not entered upon. This involves a very different proposition from the one familiarly understood, that the introduction of irrelevant testimony by one party does not justify the introduction of irrelevant testimony by the other side. It is enough to say that the counsel for the defendant introduced the subject, and he has no right

to complain of its continued consideration.  This view disposes of all the matters embraced in the seventh objection to the verdict.

The eighth objection is to testimony given by Solomon and Woodruff in reply.  No exception appears to any part of this testimony, so far as it regards that of Woodruff.  The only exception that appears to the testimony of Solomon was to his stating a conversation with Governor Moses, but. it does not appear that any such conversation as the objection contemplated was actually produced in evidence.  The exception must be regarded as limited by the character of the testimony received under it.  The other matters alleged to have been gone into, stated by the defendant as prejudicial to his case, cannot be considered for the want of an exception to cover them.  What has just been said disposes of the matter of the ninth, tenth and eleventh objections.

The remaining objections relate to the charge of the court. Many objections to the charge are stated in the grounds of appeal, some of which are not noticed in the points and argument, and as all matters intended for consideration are required by the rules of this court to be noticed in the points submitted, we must assume that the matters not so presented are intentionally abandoned by the appellant and they will not be considered.  The various points made by the appellant will be considered in the order stated in the points and argument.

The sixth objection is that the court instructed the jury that the fourth count of the indictment could be sustained.  This ruling is in accord with what has already been said.

The seventh objection states that the court instructed the jury that the entries in the books of the Republican printing company were made before the conspiracy had been consummated, and contemporaneously with the transactions, and were entitled to be considered in the corroboration of the accomplices.  This statement does not exactly conform to the statements of the record. A request to charge was made on this point by which it was sought to exclude the entries in the diary of Woodruff and the books of the Republican printing company from operating as corroborating evidence.

The record states that this had been charged in part and in

part had not, but as the charge, as given, is not set forth, we cannot infer what that charge was, unless such is the necessary inference from what follows on the record.

The court said : " This evidence has already been admitted by the court for this reason, that when these entries were made in the note-book of Josephus Woodruff the conspiracy had not been consummated, and, therefore, that they were declarations of Woodruff and Jones in furtherance of the conspiracy." This statement appears to relate wholly to the note-book of Woodruff, with which it does not appear that Jones had anything to do, and yet the statement follows, " and therefore that they are the declarations of Woodruff and Jones in furtherance of the conspiracy."

· There is evidently something omitted from this statement that it is probable might be supplied if the whole charge was produced. Subsequently the court states : " But these entries were made contemporaneously with the transactions, and they are not unsupported corroboration, but are facts noted down at the time of the transaction, and, therefore, may go in corroboration of the accomplices." It is very evident that corroboration was here meant in its general sense as something tending to produce conviction of the truth of previous testimony. There was no technical question before the jury as to whether corroborating evidence existed in the case sufficient to warrant the jury in finding according to their conviction, as to the truth or falsehood of the oral testimony given. They must have understood the court as charging that as it regards the degree of credibility to be ascribed to the testimony of the parties where memoranda were produced, it was in support of their credit that they made such memoranda contemporaneously with the transactions to which the testimony related.

There was other corroborating testimony than that afforded by these memoranda; such, for instance, as the undisputed fact that the defendant paid the certificate drawn to a fictitious person, without inquiry as to the truth of the endorsements thereon. No question could arise as to whether the state was at fault for want of evidence to corroborate the testimony of co-conspirators. Whether necessary or unnecessary, such corroboration had been

submitted, and its force alone was to be determined by the jury. Nor did the actual issue before the jury depend on acts and declarations of co-conspirators done and made in pursuance of the conspiracy. Such acts and declarations are of importance where the *terms* of the conspiracy have to be made out presumptively from the nature of the transactions following such conspiracy, and where the *fact* of such conspiracy is established. In the present case the *terms* of the conspiracy were the subject of direct proof, and the only real issue was the credibility of the co-conspirators. So the question was really narrowed down to that of the credibility of the witnesses, Woodruff, Jones and Lee; and, as bearing on the credibility of the parties who made or authorized the memoranda, the entries were proper to be considered by the jury, so that if made when and for the purpose they imported, they should be considered as circumstances giving support to such oral testimony.

This objection is not well taken. *State* v. *Brown*, 3 *Strob.* 508.

The eighth objection, as to the necessity of proof of a false token, has already been disposed of.

The ninth objection relates to the ninth request to charge, which was refused. This instruction was properly refused, as it involved the charge of the judge as to matters of fact.

The tenth objection is based on the refusal of the judge to charge that the payment of the check in the ordinary course of business in the office of the state treasurer, was not to be considered as confirmation of the evidences of the accomplices in the case. It cannot be considered that payment of a certificate or draft by the state treasurer, without any attempt to verify the identity of the person claiming to be entitled to payment, is in the due and ordinary course of business. It was clearly an act for which the defendant must be presumed responsible, and it was competent for the jury to weigh the circumstances as bearing on the question of guilty knowledge on the part of the defendant as to the character of such paper. This would lead to the conclusion that a charge excluding the jury from such examination, such as was requested by defendant, would not have been proper.

The matter of the eleventh objection has already been considered, and the conclusion reached that the means employed were of a nature to cheat and defraud the state.

There was no error in the charge made upon the twelfth request. The whole matter was left for the consideration of the jury with remarks on the part of the court that have already been explained. It is not possible that the jury could have drawn any conclusion from these remarks prejudicial to the defendant. The court stated its former ruling in regard to the Merriam certificate, and its adherence to the ground on which that decision was made, but gave no instruction as to the legal effect of such testimony. It would have been manifestly improper to charge that such evidence was entitled to no weight, as it might have a bearing on questions of credibility as affecting the testimony of the witness, Woodruff, and defendant.

The majority of the court having overruled all the exceptions, the appeal must be dismissed.

We concur in the judgment herein announced, but cannot concur in the reasonings on the question of peremptory challenge, on which point we have filed our separate opinions, differing between ourselves in the reasons but agreeing in the results.

HENRY McIVER, A. J.

A. C. HASKELL, A. J.

SEPARATE OPINION BY McIVER, A. J. I concur fully in the conclusions reached by the Chief Justice except that in reference to peremptory challenges of jurors claimed by the defendant and disallowed by the Circuit judge. As to that matter I am entirely satisfied that the ruling of the Circuit judge, in refusing to allow the defendant to challenge peremptorily the two jurors, Wiley and Fields, was correct, whatever differences of opinion may exist as to the reason given for such ruling.

In my judgment the act of 1871—re-enacted in General Statutes, Chapter CXI.—was designed to effect, and did effect, a radical change in the mode previously established of organizing a jury for the trial of a misdemeanor. The purpose was to establish marked differences in the mode of obtaining a jury for

the trial of any criminal case, whether capital or not, from that prescribed for civil cases.

In Section 19 of that chapter, (being Section 16 of the original act,) the mode of obtaining juries for the trial of civil cases is distinctly pointed out, and the distinguishing features of this mode are:

1. That the persons summoned as jurors shall be arranged in alphabetical order, the first twelve constituting the first jury and the next twelve the second jury.

2. That this arrangement shall be made " on the day when the jurors are summoned to attend ;" that is, the first day of the term.

The effect of this mode of organizing the juries is that it is distinctly known from the beginning of the term who are the persons that will compose the two juries for the trial of civil causes during the whole of that term. But in Section 22 of that chapter, (being Section 19 of the original act,) it is declared that " *nothing* contained in the preceding section shall apply to the impaneling of juries in criminal cases, but the jurors shall be called, sworn and impaneled *anew for the trial of each case,* according to the established practice," &c. This, to my mind, evinces an intention that the juries for the trial of all criminal cases shall not be organized in the mode prescribed for civil causes; that is, shall not be arranged in alphabetical order, and shall not be organized on the first day of the term, but that they shall be organized " *anew for the trial of each case,*" according to the established practice, viz., by lot, and not in alphabetical order. So that for the trial of *any* criminal case, whether capital or otherwise, the law requires: 1. That the persons who are to compose the jury shall be selected by lot; and, 2. That they shall *not* be so selected on the first day of the term, but such selection must be made " anew for the trial of each case." These two requirements are not formal, but material in their character.

It certainly is not necessary to show this in regard to the first, and it seems to me that it is equally unnecessary to enter into any argument to prove that the second is material ; for it manifestly is very material for the accused to know beforehand who are the persons to be presented to him for challenge, and the

order in which they will be presented; for that was one of the main reasons why the ninety-seventh rule of court was so rigorously assailed in the case of *State* v. *Price,* 10 *Rich.* 351, and in *State* v. *Boatwright,* 10 *Rich.* 407.

Section 22 of this chapter, (being Section 19 of the original act,) having thus declared that in criminal cases the selection of jurors should be made by lot, and should be made anew for the trial of each case, and not on the first day of the term, proceeds to declare how the lot shall be conducted, viz.: "According to established practice." This, it seems to me, is tantamount to declaring that the lot shall be conducted in the manner pointed out by the ninety-seventh rule of the former court, re-adopted by the present court in practically the same language as the twenty-sixth rule of practice in the Circuit Courts. For, prior to the adoption of the act of 1871, incorporated in the General Statutes, the "established practice" in obtaining a jury for the trial of criminal cases was different in misdemeanors from that in capital cases. In the former the juries were organized on the first day of the term by lot, and, as so organized, they constituted the juries for the trial of all cases of misdemeanor which might come up for trial during that term, subject only, just as in civil cases, to such changes as might be occasioned by challenges either peremptorily or for cause, while in capital cases the jury was organized anew for the trial of each case in the mode prescribed by the ninety-seventh rule of court.

To which practice, then, do the words "according to the established practice," as used in the section under consideration, refer? They cannot refer to the practice previously prevailing in cases of misdemeanor, because, according to my understanding of that practice, the juries were not organized anew for the trial of each case, but were organized on the first day of the term for the trial of all cases of misdemeanor which may be presented for trial during the term, and this mode of proceeding is distinctly forbidden by the previous part of the section.

These words, therefore, must necessarily refer to the practice in capital cases, as every one will admit that, under that practice, the jury was organized "anew for the trial of each case." This being so, it follows that the Circuit Court erred in the mode

which it adopted in presenting the jurors for acceptance or rejection, but as no exception was taken upon this ground, possibly for the reason that it operated in favor of the defendant, as it informed him beforehand who were the first twelve persons to be presented, such error can furnish no ground in this court for granting a new trial.

If, then, I am right in concluding that the proper mode of presenting the jurors in this case was not adopted, and that they should have been drawn anew and presented according to the established practice in capital cases, it follows necessarily that there was no error in refusing to allow the defendant to challenge peremptorily the two jurors above named. For, according to that practice, it was necessary for him to dispose of each juror as he was presented, either by accepting or rejecting him, before he could proceed to challenge any juror subsequently drawn; and if, as in this case, twelve jurors instead of one be presented at once, it would have been equally necessary for him to dispose of the twelve so presented, or of the ten which remained after the challenges on the part of the state had been allowed, before he could reach the two, Wiley and Fields, who were drawn subsequently to the drawing of the original twelve. If he had accepted the remaining ten and they had been sworn, as would have been proper under the established practice, then unquestionably he would have had the right to challenge peremptorily the two jurors above named as well as the three next who might have been drawn. But in this case, before he could, under the established practice, reach these two jurors, he had exhausted his right of peremptory challenge by challenging five of the original ten. His real ground of complaint, therefore, is, not that he was denied the right of challenge—for as the record shows he actually did exercise such right to the full extent allowed by law, by challenging five of the jurors who were originally drawn and presented—but that he was denied the right of selections, which, as is said in *State* v. *Wise,* 7 *Rich.,* at *page* 416, upon the authority of *United States* v. *Marchant,* 12 *Wheat.* 480, is an altogether mistaken view of the right of challenge, which is a mere right of *exclusion* and not a right of *selection,* and the right

of exclusion will not be allowed to be exercised in such a way as to draw after it the right of selection.

The judgment of the Circuit Court should be affirmed.*

SEPARATE OPINION BY HASKELL, A. J.   I concur in the conclusions arrived at by the Chief Justice on each point submitted for consideration, except his conclusion upon that which relates to the exercise of the right of peremptory challenge. From that conclusion I am compelled to dissent, and will state my reasons briefly, first tracing an outline of the law and established practice on which those reasons depend.   When the act of 1841, "to extend the right of challenge to jurors," was passed, the law on the subject of impanelment of jurors was as follows: "The jurymen attending, under the *venire* being called, their names are put in a hat and juries Nos. 1 and 2 are formed by alternately putting down the names as they are drawn, and when the number of each is completed it is usual for the clerk to have a list of the supernumerary jurors made out as their names are drawn for the ordinary business of the court, where vacancies are filled up *under the order of the court* and in capital cases." *City Council of Charleston* v. *Kleinbeck,* 2 *Spears* 418.

These juries, one and two, were organized and sworn at the commencement of the term and were ready for the trial of civil causes and misdemeanors, the only difference being that in misdemeanors the jurors were sworn anew in each case to try the traverse.   In cases of felony the rule was different.   The juries Nos. 1 and 2 were not presented in their entirety as ready for the trial of a capital case, but in such cases it was "the practice to present to the prisoner the jurors for challenge, beginning with the foreman of jury No. 1 and running through the petit and plea jurors Nos 1 and 2 impaneled and sworn, and then to present successively the supernumeraries as drawn on Monday." *State* v *Brown,* 3 *Strob.* 508.   The act of 1841 made no change in the manner of organizing the juries.   It enacted "that hereafter in all civil cases in which a jury shall be impaneled, before they shall be charged with the trial of any issue, each party shall have the right to challenge, without cause shown, two of the jury so

---

*See separate opinion of Judge McIver in State *v.* Smalls, *post* page 287.

impaneled, and in all criminal cases in the Courts of General Sessions wherein challenge without cause is not allowed by law, the defendant shall have the right to challenge, without cause shown, two of the jury before they are sworn to try the traverse; and the places of the jurors so challenged shall be supplied as now provided by law for completing a panel." *Stat. at Large, Vol. XI., p.* 154.

The last clause providing for the completion of the panel of necessity applied to both the preceding portions, and embraced alike civil cases and misdemeanors.

In the first place, it would be impossible in a misdemeanor case to complete the panel by the mode pursued in a capital case, as appears without argument upon comparison of the two systems of practice. And, in the next place, there was, at the time the act was passed, a settled practice, applicable alike to civil cases and cases of misdemeanor, (this is not disputed,) which regulated the filling of vacancies in the jury occasioned by removal for cause shown, or by absence or otherwise. The circumstances are precisely analogous where a juror is removed by peremptory challenge, for another juror must be supplied to complete the panel; and there can be no doubt that the mode already of force in the case of a juror removed for cause, is the mode referred to in the act of 1841 by the words "as now provided by law." What was the practice as then provided by law? The ordinary practice was to fill the place by taking the name next in order on the supernumerary list, but it was held to be " entirely competent for the court to order any supernumerary juror in attendance to take the vacant place. This will be done in all instances where there is no objection made by one of the parties. Where there is any just reason to believe that a seat has been vacated by one juryman to enable a party to supply his place with another, or where such vacancy has been procured by one of the parties, it would be proper to require, and either party in such case might always require, the names of the jurymen referred to to be subjected to another drawing." *Council* v. *Kleinbeck, supra.* That was the practice prior to the act of 1841, and it is not questioned that the practice was the same in civil cases and misdemeanors up to that time, except that in misdemeanors the juries were

sworn anew to try the traverse. The latter rule of practice above indicated seems to have been deemed necessarily the proper course where, by the exercise of peremptory challenge, it was put in the power of parties to "procure" a vacancy, and the court proceeds to say : " It is necessary, as it respects challenges under the act of 1841, that a somewhat different practice should prevail, and that a more uniform rule should be laid down. Under that act the parties themselves are actors, and they should not be permitted to make their challenges with any view to looking to any particular juror on the supernumerary list as a substitute for the one that may have been withdrawn by challenge. In this respect the challenge should be made as though it were founded in some positive objection to one or two of the panel, and with no view of acquiring undue advantages by having certain others substituted in their place, which might frequently be the case were the list from which they were to make their selection to remain unchanged—that is to allow the jurymen to be called as their names had been previously set down. To obviate all objections of this kind, and to remove all temptation on the part of juries and parties from entering into a criminal understanding, we would lay down this as an uniform rule of practice, that whenever either party on the record claims the right of challenge the names of the jurors not impaneled, if they have been previously drawn and set down, shall be subjected to lot again, *and the parties, unless they can show cause, must take them as they stand thus drawn." Id.* The *principle* which is contained in the law as thus announced was afterwards extended to capital cases by the ninety-seventh rule of court, adopted in 1856, (10 *Rich.* 549,) and sustained in *State* v. *Price, Id.* 351, and *State* v. *Boatwright, Id.* 407. In the case just cited (*Council* v. *Kleinbeck*) the court laid down what it understood to be the manner " as now provided by law for completing a panel," and applied that manner to fit the act of 1841, and thus established the practice which has never been changed, unless by the act of 1871, which will hereinafter be considered. The only subsequent case directly in point is that of *Durant* v. *Ashmore,* 2 *Rich.* 184, also a civil case. In that case " the plaintiff's counsel then challenged, under the act, the foreman, and he came off. The

counsel for the defendants challenged, on their part, another juryman, which made two vacancies. The names of the supernumerary jurors were put in a hat and two were drawn, when the plaintiff's counsel claimed the right to challenge one of them, when, an objection being made, his Honor overruled the right to challenge except for cause made." The ruling was by Butler, J., who had delivered the opinion of the court in *City Council, &c.,* v. *Kleinbeck.* In the Court of Appeals, (opinion by O'Neall, J.,) it was held that "after jurors have been challenged and others have been drawn in their places, neither party can, under the act of the legislature, challenge the jurors so drawn." *State* v. *Kleinbeck,* 2 *Spears* 418 ; *Durant* v. *Ashmore,* 2 *Rich.* 184.

It is contended, first, that this case fixes the rule only as to civil cases ; and, second, that the principles it sustains admit of question, because they are founded upon a misapprehension of what really was decided in *City Council* v. *Kleinbeck.* It is enough, on this point, to say that the probability is strongly against any such mistake as that which must be presumed to sustain such a proposition. The act of 1841 was recent, its constitutionality was in doubt, and was afterwards decided in *Creiger* v. *Bunton,* 2 *Strob.* 487, by a majority of the court; O'Neall, J., and three other members of the court dissenting. Thus it is apparent that the act had been subjected to jealous scrutiny from its inception. Further, the same eminent judge who had delivered the opinion in *Council, &c.,* v. *Kleinbeck,* and had there undertaken to expound the whole jury system as it stood, and to apply thereto the act of 1841, was the judge who ruled on Circuit in the case of *Durant* v. *Ashmore.* All the probabilities are against the supposition that he was governed by any misapprehension as to what had been announced as law by him in *Council* v. *Kleinbeck,* and his ruling was affirmed by the Court of Appeals. Not only, therefore, are the principles sustained in *Durant* v. *Ashmore,* but the decision in that case was final upon the point, and has never been overruled. Butler, J., lays down the rule in the language above cited, " and the parties, unless they can show cause, must take them as they are thus drawn." There can be only two constructions to this sentence. One is, that the

parties must submit to such *mode of drawing* unless they can show cause against it. The other is, that they must accept as jurors the parties thus drawn, unless they can "show cause" against them *as jurors*, such as legal disability, partiality or the like. The latter seems to me to be the construction fully sustained by the context, and to be the most reasonable.

The real question, therefore, is not about what is the rule established in *Council* v. *Kleinbeck* and *Durant* v. *Ashmore*, but whether that rule applies to the whole act of 1841, and therefore embraces misdemeanors, which are described in the act as "criminal cases in the Courts of General Sessions, wherein challenge without cause is not allowed by law." It has been already said and cannot be questioned, that when the act of 1841 was passed the law was exactly the same in civil cases and misdemeanors with regard to the formation of a jury and the manner of completing the panel in the event of a vacancy occurring. The only difference being, as already said, that in a misdemeanor, after the panel was completed, the jurors had to be sworn anew. The rule, as above stated, was the law in civil cases, not because it was so announced, but because it was made law by the act. The rule therein announced was the law for the completion of a panel as the law stood at the time the act was adopted, and by the act the same was made law for the completion of the panel when a vacancy occurred under the act. The same was the pre-existing law in misdemeanor cases; the same was the provision for vacancies occurring by reason of the act in misdemeanor cases, and the conclusion is unavoidable, that the rule, *as laid down by the court*, must be applied in a misdemeanor case exactly as it was applied by the court in a civil case. Besides, if the rule of challenge and completing the panel, in misdemeanor, is not the same as in civil cases, there can be no other rule than that which prevails in capital cases; and, as already shown, the application of the practice in capital cases to a jury organized to try a misdemeanor, was, as the law then stood, a practical impossibility. This is forcibly illustrated by examining the forms and details of practice contained in Miller's Compilation, pp. 140, 149, Nos. 24, 28, 59, &c. In case of misdemeanor: "Of jury No. 1, E. D. is excused from sitting. E. L. being a kinsman of defend-

ant, is challenged for cause on the part of the state, and G. T. and T. L., supernumeraries, substituted. E. P. and M. J. are peremptorily challenged by the defendant, and A. R. and S. B. drawn from the supernumeraries in their room, the jury then consisting of," &c. *Miller* 149. The authority of the forms in *Miller* is unquestionable. Many of the rules of practice which had descended from hand to hand for many generations would have been lost during the years of revolution recently passed, had they not, by the unselfish industry of one of the best-versed and most accurate members of the former bench, been collected and perpetuated in this invaluable little volume of practice and forms. By comparison it will be seen that the ruling of the Circuit judge in the case before us, and the entire proceeding with regard to the jury, was *mutatis mutandis,* in exact conformity to the old practice under the act of 1841, *and* the law as it stood at that time. The question, therefore, to be considered is, whether the law, in such respect as affects the point in question, has been changed since 1841.

The act of 1871, p. 690, " An act to regulate the manner of drawing juries," repeals the jury act of 1868–9, " and all other acts and parts of acts in any way conflicting with the provisions of this act." This act is re-enacted in the revised statutes, and is of the same force and effect as when it was passed, notwithstanding the repeal of the pre-existing jury acts by the act which established the revised statutes. We must endeavor to ascertain to what extent the law, as it stood in 1841, after the passage of the act, is in conflict with the act of 1871. *Rev. Stat.,* § 19, 522. It is patent that an important change is effected by the act of 1871, with regard to the formation of juries for civil causes, and that the right of peremptory challenge in misdemeanor cases is enlarged to two on the part of the state and five on the part of the defendant. But the question is whether the manner of forming a jury or of exercising the right of challenge is changed as to misdemeanor cases by the act of 1871. Section 19 of the act (*Rev. Stat.,* § 22, 522,) is as follows : " Nothing contained in the preceding sections shall apply to the impaneling of juries in criminal cases, but the juries shall be called, sworn and impaneled anew for the trial of each case, *according to the established*

*practice,* and their foreman shall be appointed by the court or by the jury when they retire to consider their verdict." All the preceding sections relate to the drawing and summoning of jurors or to the formation of juries for the trial of *civil* causes. It is well to note that they contain no provision for the formation of juries for the trial of criminal cases, either misdemeanor or felony. It cannot be said that the provisions for the formation of juries for civil causes extend to misdemeanors, for the words are imperative: "*Nothing* contained in the preceding sections shall apply to the impaneling of juries in criminal cases." The succeeding sections relate to other subjects. We are, therefore, forced to conclude that juries for the trial of cases both of felony and misdemeanors must be formed out of the jurors summoned in the manner provided by law prior to the passage of the act of 1871, subject only to the change as to the right of peremptory challenge, (Section 37 of the act, and *Rev. Stat.* 748, § 3,) and to any change or modification that may be contained in Section 19, which is above cited in full. As regards that section it is argued that the words "called, sworn and impaneled anew for the trial of each case" limit the meaning of the words "according to the established practice" to cases of felony; because, as it is said, under the former practice the jury was not "called, sworn and impaneled anew" in each case of misdemeanor, but was so "called, sworn and impaneled anew" in each case of felony.

There are two answers to this. *First.* I admit that the nineteenth section embraces all criminal cases, for although the two classes are more properly designated by the terms "crime" and "misdemeanor," yet, in common language, both are described by the word "crimes," as in the act of 1841 that the word is used to express misdemeanors alone. It will not be disputed that there were, prior to the act of 1871, and subsequent, if not affected by that act, two distinct, established modes for the organization of juries—one for the jury in misdemeanor cases; the other for the jury in cases of felony. If it had been the intention to abolish one of these two modes, and subject both classes of cases to the other mode, it would have been easy to have expressed it definitely, as by saying, in this instance, "according to the estab-

lished practice in capital cases." It is against all rule to construe by implication the repeal of an important law, if it can be reasonably avoided. If the words "called, sworn and impaneled anew" can be shown to apply in part to each class of cases, so as, when taken in the light of a general act, it makes provision for each, and such construction is not repugnant to the context, and will prevent the repeal of laws which are not expressly repealed, we are bound to adopt it and give to the law its full force and effect. To illustrate: No one will deny that, under the law as it was, in each misdemeanor case the jurors who had been previously generally sworn were sworn anew to try the traverse. Now, suppose that in a capital case the jury was only called and impaneled anew, and a general act was passed, as in the present case, not repealing distinctive acts relating to the two classes of cases, but containing words thus descriptive of each class. I contend that these words "called, sworn and impaneled" would be descriptive of the separate classes in their distinct character, and would not of necessity reduce them to one class, and thereby by implication repeal the distinguishing or conflicting statutes—one class being designated by the descriptive word "sworn," the other by the words "called" and "impaneled."

But, *secondly:* I go much further, and think that under the then established practice the jury was "called, sworn and impaneled anew for the trial of each case" of misdemeanor, as well as each case of felony. Any one who is at all familiar with the practice is aware that the term "call" is entirely distinct from the "drawing" of jurors. In every case the jury is "called" by the clerk of the court to ascertain who of the jurors are present, and whether the jury is ready for the trial of the cause. The word has absolutely no other significance. The order of the court is familiar, "Mr. Clerk, call over the jury," and incident to every trial, and can properly only be done after the jurors have been drawn and the jury organized. Under the practice prior to the rule of court adopted in 1856, Rule 97, which is Rule 26, adopted in 1870, the following was, in a capital case, the form at the trial: "Clerk—Having a list of all the jurors in attendance arranged in order, (2 *Bail.* 32,) to wit: First, jury No. 1; second, jury No. 2; third, supernumeraries,

R

as they were originally drawn,   *   *   *   and having *called* all over to *ascertain which are in attendance*, addresses the prisoner in the dock," &c.   *Miller, p.* 155.   That expresses the whole meaning and purpose of the " call " of the jury, even in a case of felony.   This was not changed by the Rule 97 or Rule 26, for before the jurors' names could be put in the hat or box to be drawn it had to be ascertained who were in attendance, and the clerk had to go through the call of jury No. 1, jury No. 2, and the supernumerary list, which had to be previously organized under the law, for the rule of court could not dispense with the previous formation of the respective juries and the supernumerary list.   The conclusion, therefore, is plain that the requirement that the jury should be " called " anew for the trial of each case, does not of necessity mean that a misdemeanor case shall be governed by the rules of practice regulating the formation of juries in cases of felony.

The second requirement, " sworn anew," does not demand argument.   It is the recognized law that in every case of misdemeanor the jury has to be sworn to try the traverse before it can be charged with the case.   It is equally well known that under the jury law then of force, (and still of force, if the views here expressed be correct,) the jurors had been previously sworn to organize juries No. 1 and No. 2, and, consequently, that by administering the second oath the jury is as well sworn anew in a misdemeanor case as in a capital case.

On the third point, that the jury shall be " impaneled anew for the trial of each case," there appears to be nothing inconsistent with the proposition that it is met by the practice in misdemeanor as well as in capital cases.   The jury was originally formed by the selection of twelve men by the sheriff, their names were written on a schedule and the jury was then said to be " impaneled," and that of " twelve men " was to try the case. Therefore a jury, in the strict sense of the word, is said to be " impaneled " when it is ready to be charged with the case.   1 *Whart. on Am. Crim. Law,* § 590.   The right of challenge subsequently arose and additional jurors had to be summoned to complete the panel, in the event that any members of the jury *first* impaneled and ready to try the cause should be removed by

challenge or otherwise. Thus the panel of a jury can be formed or "impaneled," and the panel can be broken and be re-formed or impaneled anew, according to the rules or requirements in every case. And again in a capital case, prior to Rule 97 or Rule 26 of 1870, if neither the state nor the prisoner challenged a juror—although the panel had not been broken, and the case would be tried by the entire panel as it was first organized—it was nevertheless considered to be "impaneled anew," because it had been organized anew by the ceremony of presenting the jurors to the prisoner and swearing each juror anew. There is no difference in principle between that case and the practice in misdemeanor, where the jury is presented in a body or as a whole, instead of one by one, and subjected to a challenge, and then, and not until then, sworn anew to try the traverse and ready to be charged. It may be admitted that this is so, yet that the case does not apply, because, under the rule of court, the jury No. 1 or No. 2 could not be accepted as a whole, for the names are put together and drawn by lot. The answer to that is, that the rule of court is not a part of the statutory law and is distinct therefrom. The rule could be repealed at any time, and then the proposition could not be disputed. It is certain that the legislature did not contemplate the rule of court as affecting a statute, and certainly it would be very extraordinary for the court to recognize it in any such light.

My conclusion, therefore, is, that the jury having been "impaneled" when jury No. 1 and jury No. 2 were organized, and being then presented for objection to the prisoner and to the state, and having to be re-sworn before it can be charged with the trial, it is, of necessity, impaneled anew for the trial of each case, whether it be felony or misdemeanor, independently of Section 19 of the act of 1871.

I am, for these reasons, unable to perceive any force in the argument that the eighteenth section of necessity brought misdemeanor cases within the rules applicable to the formation of juries in capital cases. Nor do I perceive any such effect from the thirty-seventh section of the act of 1871, re-enacted in Revised Statutes, p. 748. The only argument is that the number of challenges is increased and the right extended to the state, and

that the act of 1841 is repealed by the act of 1872. *Rev. Stat.*
830. The act of 1841 was not repealed by the act of 1871,
according to my opinion,. and the provision contained in the Re-
vised Statutes 748 was the Section 37 of the act of 1871. The
act of 1871 not having repealed the act of 1841, was governed
by its provisions where not in conflict with its own, and the act
of 1871 was not repealed by the act adopting the Revised Statutes,
and is, therefore, still of full force and effect, and its construction
must be principally governed by *what* was manifestly its mean-
ing at the time when it was adopted. The right of challenge, as
given in the act of 1871, was unquestionably to be governed by
the provisions contained in the said act and by the law as it then
stood, not repealed by or in conflict with said act. But apart
from this, if all the acts with regard to jurors prior to the act of
1871 be repealed in form by the Revised Statutes act, they are
all brought into force in criminal cases of both clauses by the
words of Section 19, "according to established practice," and to
that practice we must look for our rule, and in each case where
there is no statute now of force be governed by the "established
practice." I am, therefore, for the reasons thus briefly and too
crudely stated, led to the unavoidable conclusion that there was
no error in the ruling of the Circuit judge on the point submitted,
and therefore that the appeal should be dismissed and motion
refused.

But suppose that my construction as to the jury law is errone-
ous, and that the opinion which I understand to be entertained
by the Chief Justice and the other Associate Justice on that sub-
ject is correct, viz. : That by the act of 1871, Section 19, the jury
law is made the same in cases of misdemeanor as in cases of
felony. Then, such being the premises, I fully concur in the
conclusion deduced therefrom by the other Associate Justice, for,
in my opinion, it rests upon principle. In the organization of a
jury in a case of felony the principle which governs the exercise
of peremptory challenge is, as I understand it, as follows : That
the state and the prisoner must dispose of each juror in the order
presented before the right of peremptory challenge can be exer-
cised with respect to any other juror. Now, whether by law or
by irregularity (no objection being taken at the time and the

irregularity not affecting any substantial right), several jurors be presented at once, or the whole twelve being presented at once, the same principle must govern, and the state and the accused must accept or object to and in effect dispose of the entire number thus presented, and those not objected to be sworn before either party can challenge peremptorily any other juror. In this case the whole twelve were presented together, and when the defendant attempted to challenge two supernumerary jurors who had been drawn to fill two vacancies occasioned by peremptory challenge on the part of the state, he, the defendant, had not accepted or objected to any of the remaining ten of the twelve originally presented, and, therefore, the twelve had not been disposed of, although presented. The defendant then proceeded to dispose of the remaining ten, and did not after disposing of them renew his objection to the first two drawn to fill the vacancies. The ruling of the judge was, therefore, right at the time when the objection was made, and whether he stated a wrong reason is immaterial; the defendant was bound to make his objection at the proper time. But the defendant could not renew his objection because he had exhausted his right of peremptory challenge by having challenged peremptorily five of the jurors originally presented. He, therefore, by his own action, waived his exception to the ruling and has no ground in either view on which to rest his appeal.

The irregularity in the presenting of the jurors, (for it certainly was irregular if the practice in capital cases was to govern,) so far from affecting a substantial right, was in favor of the defendant, for it was directly in face of Rule 97 adopted in 1856 and Rule 26 adopted by the court in 1870, and informed the defendant in advance of the order in which twelve jurors would be presented, and made the right of peremptory challenge an instrument for the selection of, instead of objection to, jurors which the rule of court was meant to prevent. So again the irregularity in the order in which the two supernumeraries were drawn, (if it was an irregularity,) did not affect a substantial right of the defendant, but was favorable to him, and as is indicated in *State* v. *Brown*, 3 *Strob.* 508, was really an advantage to the defendant, for he thereby knew in advance who would be the

first two presented to him after the ten who were then before him had been disposed of, and to that extent gave him the means of selection in addition to his right to object. This, of course, is said upon the presumption that the practice in capital cases is to govern, in which I cannot agree. But upon either of the legal premises submitted the appeal should be dismissed and the judgment of the Circuit Judge affirmed.

Appeal dismissed.